**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:04cr54 |
| | ) | |
| LYNDA LORRAINE WOODS | ) | |

## <u>MEMORANDUM OPINION</u>

McLAUGHLIN, J.

Presently pending before the Court is a motion to suppress filed by Defendant Lynda Lorraine Woods. Woods seeks to suppress methamphetamine and methamphetamine paraphernalia police seized during searches they conducted on August 20 and October 20, 2004. She also seeks to suppress statements she made to investigating officers following both searches. On May 25, 2005, we held a hearing at which testimony was taken and exhibits were received. For the following reasons, Woods' motion will be denied.

## I. FINDINGS OF FACT

On March 12, 2003, Pennsylvania State Police executed a search warrant at the home of Defendant Lynda Woods and her husband Michael Woods in Venango County. Michael later pled guilty to manufacturing methamphetamine and was incarcerated at the Erie County Prison. While in prison on August 13, 2004, Michael told Pennsylvania State Police Troopers Bill McClellan and Ron Wilson that they could find additional methamphetamine paraphernalia at his home.

On August 17, 2004, Troopers McClellan and Wilson traveled to the Woods' farm in Venango County and met Lynda Woods. The Troopers obtained her written consent to retrieve

1

the items described by her husband.  At the farm, the Troopers recovered methamphetamine precursors and equipment, including "iodine crystals, hypo-phosphate, solvents, plastic tubing, pill extraction container and various lab glassware." (Defendant's Exhibit B, p. 2).  The Troopers called the Pennsylvania State Police Clandestine Laboratory Response Team to handle the methamphetamine equipment.

During their visit, the Troopers observed several severely emaciated horses. Subsequently, Trooper McClellan contacted Rebecca McDonald of the Pennsylvania Society for the Prevention of Cruelty to Animals.  Ms. McDonald told McClellan that she removed seven emaciated horses from the farm on May 7, and that Woods' animals had not been seen by the local veterinarian in over 2 years.

On August 20, the Trooper obtained a warrant from District Justice David Fish to seize all neglected animals at the farm.  Troopers McClellan, Hendricks and York, Ms. McDonald and Pennsylvania State Police Chemist John Kelton traveled to the Woods' farm.  Upon their arrival, Mrs. Woods emerged from the barn's lower level and the Troopers presented her with a copy of the search warrant.   Inside the barn, the officers were alarmed when noxious smoke began flowing out of a backroom in the barn basement.  York and Kelton looked inside the room and saw the smoke spilling out of a glass jar.  The officers immediately suspected Woods had been manufacturing methamphetamine.  The officers evacuated the barn, summoned the Clandestine Laboratory Response Team and returned to District Justice Fish for a second search warrant.

A few hours later, Fish issued a warrant authorizing the officers to seize methamphetamine, methamphetamine precursors and production equipment.  The Troopers,

joined by State Drug Task Force agents, returned to the farm and seized methamphetamine precursors along with equipment containing methamphetamine residues.[1]

On October 19, 2004, Jeffrey Roydes presented at the Titusville Police Department and informed Titusville Police Officers Clarence Peterson and Tim Russell and Pennsylvania Bureau of Narcotics Investigation of methamphetamine-related activity by the Defendant. Roydes explained that on October 17 and 19, he personally witnessed Woods cook methamphetamine in a second floor room in Woods' house. In both instances, he noticed the presence of common methamphetamine precursors and equipment, including iodine, matchboxes, clear hoses and a beaker filled with red liquid sitting on a lit Coleman stove. Ordinarily, Roydes indicated, Woods hid these items in a safe within her second-floor bedroom.

According to Roydes, Woods prepared the drug at night because she believed police could not obtain a warrant after 9 p.m. She refined methamphetamine solution into its powdered form in her barn or in the woods near her home. Each "cook," which Woods undertook three to four times a week, yielded ten to twenty grams of methamphetamine. Roydes indicated Woods usually smoked some of the methamphetamine and then traded the remainder for OxyContin in Oil City.

Ultimately, the officers interviewed Roydes three times, in part to test the accuracy of his story. In addition, the officers asked Roydes why he sought to inform them of Woods' activities. Roydes claimed he was concerned with the safety of Woods' daughter, Lacey. Meanwhile, Agent Golenberke called fellow BNI Agent Ronald Golembeski for specifics on Roydes' record of cooperation.

---

[1] The Government and Woods' counsel indicated to the Court that an indictment based upon the August 20 search was not issued before the October 20 search took place. The former indictment was superseded by an indictment combining the results of both the August and October searches.

Agent Golembeski informed Golenberke that in 2001, he participated in a methamphetamine conspiracy investigation involving methamphetamine kingpin Roger Coulter. The Coulter investigation netted 20 convictions and guilty pleas, including a guilty plea by Roydes. Golembeski informed Golenberke that Roydes was reliable in that he 1) gave truthful testimony which led to the conviction of methamphetamine dealer Fred Perry; 2) provided information on Coulter, who was convicted in a separate trial; and 3) provided information regarding Shawn Adams, Rickey Richards and Laraine Donovan, all of whom later pled guilty to methamphetamine-related offenses.

Based upon the information Roydes provided, Peterson prepared a warrant application. In the supporting affidavit, Peterson identified Roydes as a "confidential informant" and recounted Roydes' report in detail. Peterson indicated Roydes' story conformed with his own specialized knowledge of methamphetamine production. The affidavit read, in pertinent part:

> "The confidential informant has proven to be a reliable source of information in the investigation and prosecution on drug cases. He/She was a witness for the Attorney Generals' Office in the prosecution of drug cases[sic]." (Def. Exhibit C, p. 4, paragraph 4)."

Although he did not reference the August 2004 seizures, Peterson noted Woods' husband was incarcerated for producing methamphetamine at the same residence. Peterson's warrant application was reviewed and approved by the Venango County District Attorney. After the Venango County District Attorney reviewed and approved the warrant application, Peterson submitted it to District Justice Fish.

At 8:35 p.m., Fish issued a search warrant authorizing the seizure of methamphetamine, methamphetamine precursors and equipment. The officers executed the warrant at 11:15 p.m. In a second-floor bedroom in Woods' house, the officers discovered iodine, red phosphorous,

4

hydriodic acid, fifty grams of pseudoephedrine, methamphetamine production equipment and methamphetamine in its unfinished form. The officers also discovered two garbage bags full of matchboxes, ordinarily used to compile red phosphorous, in a bedroom belonging to Woods' daughter Lacey.

## II. DISCUSSION

Woods seeks to suppress the fruits of the August 20 searches. Woods argues Pennsylvania law requires anyone investigating alleged cruelty to animals to obtain the district attorney's approval as well as a search warrant based upon probable cause. 3 Pa. C.S.A. § 456.6. Woods' argument, however, is foreclosed by the Third Circuit's holding in *United States v. Rickus*, 737 F.2d 260, 363 (3d Cir. 1984); *U.S. v. Williams*, 124 F.3d 411, 428 (3d Cir. 1997). The *Rickus* Court held, "[i]t is a general rule that federal district courts will decide evidence questions in federal criminal cases on the basis of federal, rather than state, law." *Rickus* at 363. Evidence seized in accordance with federal law is therefore admissible in federal court even if it was obtained in violation of state constitutional or statutory law. *Rickus* at 364. Here, consistent with *Rickus*, failure to comply with Pennsylvania procedural law does not implicate a federal right. We therefore deny Woods' attempt to suppress the fruits of the August 20 searches.

Woods seeks to suppress the fruit of the October 20 search on two bases. She argues 1) the affidavit is facially inadequate because it failed to provide District Justice Fish sufficient indicia of the confidential informant's reliability; and 2) Peterson knowingly or recklessly withheld material information impacting the C.I.'s credibility.

In *Illinois v. Gates*, the Supreme Court explained, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons

supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. 213, 238 (1983).

The reviewing Court's role is limited to discerning whether the magistrate had a substantial basis for concluding probable cause existed. *See U.S. v. Williams*, 3 F.3d 69, 71 (3d Cir. 1993), *citing Gates*, 462 U.S. 213, 238-239 (1983). *Gates* directs us to give strong deference to the magistrate's determination and avoid interpreting the affidavit in a "hypertechnical, rather than a common-sense, manner." *Gates* at 236. We read the affidavit in its entirety and confine our review to the facts before the magistrate. *United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001), *citing United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993). While we will not simply rubber stamp the district justice's determination,  "the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *United States v. Jones*, 994 F.2d 1051, 1058 (3d Cir. 1993), *citing United States v. Ventresca*, 380 U.S. 102, 108 (1965).

Prior to *Illinois v. Gates*, the Supreme Court required that police provide a magistrate with information establishing an informant's basis of knowledge and the informant's veracity. *See Aguilar v. Texas*, 378 U.S. 108 (1964); *Spinelli v. United States*, 393 U.S. 410 (1969). The *Gates* Court expressly disavowed this "two-pronged" test of informant reliability. *Gates* at 230. The *Gates* Court explained that an informant's basis of knowledge and veracity remain "highly relevant." *Id*. However, these factors are "closely intertwined issues that may usefully illuminate the common-sense, practical question whether there is "probable cause" to believe that contraband or evidence is located in a particular place." *Id*. In addition, the Court indicated, "[a] deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Gates* at 234.

6

Viewed in isolation, Peterson's statement that "[t]he confidential informant has proven to be a reliable source" is insufficient to establish the C.I.'s reliability. However, read in its entirety, the affidavit gave Fish a substantial basis for crediting Peterson's assessment of the C.I.'s report and for finding probable cause. First, the C.I.'s explicit account suggested he was intimately familiar with Woods' criminal activities: he provided very particularized information regarding when, where and how often Woods cooked methamphetamine. *United States v. Nelson*, 284 F.3d 472, 483 (3d Cir. 2002). Second, Fish could infer the officers had no reason to doubt the C.I.'s credibility. *See United States v. Williams*, 3 F.3d 69, 72 (3d Cir. 1993). We note the officers conducted a lengthy interview during which they had an opportunity to assess C.I.'s demeanor. *U.S. v. Valentine,* 232 F.3d 350, 354 (3d Cir. 2000). Further, the officers knew the C.I. – unlike an anonymous informant – and could have held him accountable for fabricated accusations. *Valentine,* 232 F.3d at 355. We also observe that the police acted quickly to follow up on Roydes' report by seeking a warrant just hours after the interview. *Id.* Third, Roydes' thorough description of the cooking process conformed with Peterson's specialized knowledge of methamphetamine production.[2] *See Nelson*, 284 F.3d 472, 482 (3d Cir. 2002). Finally, Peterson's affidavit noted the fact that Michael Woods was already incarcerated for cooking methamphetamine at the same residence. Consequently, we reject Woods' contention that the affidavit was facially inadequate.

Alternatively, Woods argues Officer Peterson knowingly or recklessly misled District Justice Fish. In this regard, Woods alleges the investigating officers knew Roydes possessed a strong motive to frame Woods when he spoke with them on October 19. Woods also argues the officers intentionally or recklessly withheld information indicating Roydes sold fake

---

[2] Woods opines anyone would know what steps and ingredients are involved in methamphetamine production. Even if we assume an ordinary person would be familiar with the gassing process, for instance, it is unlikely "anyone" would know that Woods rode her four-wheeler to refine unfinished methamphetamine in the woods near her home. (See Def. Exhibit C).

methamphetamine to undercover police officers. Finally, Woods contends that contrary to the assertion in the affidavit, Roydes' previous cooperation with the police was quite limited.

In *Delaware v. Franks*, the United States Supreme Court held the Fourth Amendment requires suppression of evidence discovered pursuant to a warrant, where police knowingly, intentionally, or recklessly include false material information in the supporting affidavit.[3] *Franks*, 438 U.S. 154 (1978). In order to secure suppression of the evidence, the defendant is required to show, by a preponderance of the evidence, 1) the affiant omitted or falsified information in the affidavit either knowingly and intentionally or with reckless disregard for the truth;[4] and 2) that there would have been no probable cause but for the false material. *See United States v. Frost*, 999 F.2d 737, 743 (3d Cir. 1993). Affidavits are presumptively valid, and negligence or innocent mistakes are insufficient to require excision of the allegedly false portions of the affidavit. *Wilson v. Russo*, 212 F.3d 781, 787 (3d Cir. 2000). If the affidavit in question, absent the allegedly false information, fails to support probable cause, the evidence discovered as a result of the affidavit must be suppressed. *Franks*, 438 U.S. 154, 155-56 (1978). Over the Government's objection, we conducted a *Franks* hearing.

We find Woods failed to demonstrate Roydes' previous cooperation was limited to a single case. The record indicates Roydes provided information to the police regarding at least five individuals and that two were prosecuted in separate proceedings. An officer omits information with reckless disregard for the truth when "any reasonable person would have known

---

[3] Although *Franks* dealt only with affirmative statements, the Third Circuit has applied *Franks* to material omissions as well. *See Russo* at 787*; Frost*, 999 F.2d 737, 743 (3d Cir. 1993), *citing United States v. Calisto*, 838 F.2d 711, 714-16 (3d Cir. 1988).

[4] During the suppression hearing, Woods' counsel correctly pointed out that the affidavit would be invalid despite Peterson's ignorance if Golenberke or Golembeski knowingly or recklessly embellished Roydes' record. According to *Franks*, "[p]olice cannot insulate one officer's deliberate misstatement merely by relaying it through an officer-affiant personally ignorant of its falsity." *Franks*, 438 U.S. 154, 164 n.6 (1978).

that this was the kind of thing a judge would wish to know." *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000). Here, we find nothing misleading in the affidavit concerning the nature of Roydes' prior cooperation.

Woods also argues the police misled Fish by omitting the fact that Roydes sold fake methamphetamine to an undercover police officer. As noted *supra*, Roydes charged Trooper York for five grams of methamphetamine but in fact took a gram for himself. In another transaction, Roydes gave Trooper York five grams of crushed caffeine pills in exchange for $500. Woods has failed to show "any reasonable person would have known" this information was material to Fish's determination. While Roydes' duplicity may establish he is an untrustworthy methamphetamine dealer,[5] this information would not have impacted Fish's determination in any material sense.

Finally, Woods alleges the officers knew of Roydes' motive to fabricate accusations against Woods. The record reveals that on October 19, Woods assisted Holly Kinnear in filing harassment charges against Roydes. Woods failed to demonstrate, however, that any of the officers knew these charges were filed against Roydes at the time they prepared the October 20 warrant application. At the suppression hearing, the officers testified they did not know Kinnear filed charges against Roydes before they submitted the warrant application. (Trans. 17-18, 24-25). We credit this testimony.

---

[5] Roydes testified at Perry's trial that he short-changed the agent because he suspected he was dealing with the police.

9

### III.  CONCLUSION

For all the foregoing reasons, Woods' motion to suppress the fruits of the August and October searches is denied.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA      )
                               )    1:04cr54
        v.                   )
                               )
LYNDA LORRAINE WOODS     )

## O R D E R

AND NOW, to wit, this eighth day of July, 2005, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Defendant Lynda Lorraine Wood's Motion [Doc. No. 22] to Suppress is hereby DENIED.

s/  Sean J. McLaughlin
United States District Judge

cm: All parties of record.

11