IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )  Criminal No. 04-54 Erie |
| | ) |
| LYNDA LORRAINE WOODS | ) |

**POSITION WITH RESPECT TO SENTENCING FACTORS**

AND NOW, comes the defendant, Lynda Lorraine Woods, by her attorney, Thomas W. Patton, Assistant Federal Public Defender, and respectfully files this Position With Respect to Sentencing Factors.  In support thereof Counsel states:

I.  THE GUIDELINES ARE MERELY ADVISORY

Under the Supreme Court's ruling in United States v. Booker, 542 U.S. ___, 125 S.Ct. 738 (2005), the Sentencing Guidelines are advisory, and this Court's sentence is no longer driven and controlled by the rigidity of the Sentencing Guidelines.  Rather, in Booker's wake this Court must impose a sentence **"sufficient, but not greater than necessary"** to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2). 18 U.S.C. § 3553(a)(1).  Section 3553(a)(2) directs the Court to consider the need for the sentence imposed:

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)   to afford adequate deterrence to criminal conduct;

(C)   to protect the public from further crimes of the defendant; and

(D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

The Court must also consider the nature and circumstances of the offense, and the history and

characteristics of the defendant, the kinds of sentences available, the sentence recommended by the sentencing guidelines, the need to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to victims of the offense. 18 U.S.C. § 3553(a)(1), (3), (4),(5),(6), and (7).

## II. THE PROPER ADVISORY GUIDELINE IMPRISONMENT RANGE.

The Court has to consider the imprisonment range recommended by the sentencing guidelines when imposing sentence. It is therefore critical that the advisory guidelines be properly calculated. The presentence report imposes a 6-level increase in Mrs. Woods' offense level pursuant to U.S.S.G. § 2D1.1(b)(6)(C) which states:

> If the offense (i) involved the manufacture of amphetamine or methamphetamine; and (ii) created a substantial risk of harm to the life of a minor or an incompetent, increase by 6 levels. If the resulting offense level is less than level 30, increase to level 30.

Application note 20 to § 2D1.1 directs the Court to consider four factors when determining if the manufacture of methamphetamine created a substantial risk of harm to the life of a minor. The four factors are:

(i)   The quantity of any chemicals or hazardous or toxic substances found at the laboratory, and the manner in which the chemicals or substances were stored.

(ii)  The manner in which hazardous or toxic substances were disposed, and the likelihood of release into the environment of hazardous or toxic substances.

(iii) The duration of the offense, and the extent of the manufacturing operation.

(iv)  The location of the laboratory (e.g., whether the laboratory is located in a residential neighborhood or a remote area), and the number of human lives placed at substantial risk of harm.

Applying these factors to Mrs. Woods case reveals that there was not a **substantial risk of**

**harm to the life** of any minor. The highlighted words are important. The 6 level increase does not apply if there is a risk of some injury, or even a substantial risk of some injury to a minor. The increase only applies if there is a **substantial** risk of harm to the **life** of the minor. United States v. Landmesser, 378 F.3d 308, 312-12 (3rd Cir. 2004) (tenets of statutory construction apply to guidelines and under tenets of statutory construction court must avoid interpretation of statute that renders any phrase superfluous). Neither the government nor the probation officer have provided any facts to this Court that Mrs. Woods' conduct created a substantial risk of harm to her daughters' lives. This enhancement cannot be justified by simply invoking the mantra that manufacturing methamphetamine is dangerous. The government must provide specific proof that Mrs. Woods' offense created a significant risk of harm to her daughters' lives.

There is no doubt that Mrs. Woods was manufacturing methamphetamine using the "red phosphorus" method. It is necessary to have a proper understanding of this process to understand the danger, and lack thereof, presented in the different stages of the manufacturing process. In the red phosphorus method of manufacturing methamphetamine ephedrine or pseudoephedrine[1] is "cooked" into methamphetamine by mixing it with hydriodic acid. The hydriodic acid reacts with the ephedrine and "reduces" it into methamphetamine by removing the beta hydroxyl group from the ephedrine molecule. Removing the beta hydroxyl group changes the solubility of the molecule

---

[1]For purposes of manufacturing methamphetamine it makes no difference if ephedrine or pseudoephedrine is used. The only difference between ephedrine and pseudoephedrine is that in three-dimensional space a hydrogen atom is pointed one way in ephedrine and pointed another way in pseudoephedrine. In two-dimensional space, i.e. drawing a picture of an ephedrine or pseudoephedrine molecule on a chalkboard, there is no difference between the two. Using ephedrine or pseudoephedrine as the precursor does not change the cooking process or affect the product produced. Accordingly, for the remainder of this filing Mrs. Woods will simply refer to ephedrine.

from water soluble to lipid soluble. Because the methamphetamine molecule is lipid soluble, it can be readily absorbed by the brain from the blood stream. Water soluble molecules, such as ephedrine, cannot be readily absorbed by the brain from the blood stream. Accordingly, methamphetamine has much more of an impact on the brain then ephedrine.

To cook ephedrine into methamphetamine you must first have ephedrine. Ephedrine is the active ingredient in several common over-the-counter medicines which usually come in tablet form. Only a small portion of the tablet is actual ephedrine so the ephedrine has to be extracted from the tablets. Once you have the ephedrine you can begin cooking methamphetamine.

The ephedrine is mixed with red phosphorus, iodine and water in a "reaction vessel." The reaction vessel can be anything from a glass beaker to a metal bucket. The red phosphorus, iodine, and water react to form hydriodic acid. The mixture is heated, and the ephedrine and hydriodic acid react to reduce the ephedrine to methamphetamine by removing the beta hydroxyl group from the ephedrine molecule. Additional red phosphorus can be added to help the reaction proceed more efficiently but is not absolutely necessary.

After the ephedrine and hydriodic acid solution has cooked, if things have gone right some of the ephedrine will have been reduced to methamphetamine. The contents of the reaction vessel are then allowed to cool and then strained through a coffee filter. The coffee filter strains the red phosphorus out of the reaction mixture leaving the methamphetamine and the water remaining from the reaction.

The reaction mixture, which contains the methamphetamine, is highly acidic. Water and lye are added to the mixture to change the ph level of the methamphetamine from acidic to base. An organic solvent is then added to the mixture, and the mixture is shaken or stirred. The mixture

will then separate into two layers. The top layer will be the organic solvent. The bottom layer will be the water. The methamphetamine is soluble in the organic solvent but not soluble in water. Because the methamphetamine is soluble in the organic solvent, the methamphetamine will be dissolved in the top layer of organic solvent.

The top layer of the mixture, the solvent and methamphetamine, is siphoned off. The organic solvent is then "gassed" with hydrochloric acid to remove the methamphetamine from the solvent. To produce the hydrochloric acid you can mix muriatic acid with aluminum foil. The Muriatic acid and aluminum foil are mixed together in a bottle with a tight fitting lid. A hole is put in the lid and a plastic hose is inserted through the lid. The other end of the hose is placed in the organic solvent containing the methamphetamine. The Muriatic acid and aluminum foil produces hydrochloric gas which travels through the plastic hose into the organic solvent and methamphetamine. The hydrochloric gas reacts with the methamphetamine turning it from a base form into a salt form, methamphetamine hydrochloride. Methamphetamine hydrochloride is soluble in water but is not soluble in organic solvents. Because the methamphetamine hydrochloride is not soluble in an organic solvent, it will start to crystalize and fall to the bottom of the container holding the mixture of organic solvent and methamphetamine. The methamphetamine hydrochloride, which is now in a crystal form at the bottom of the container is filtered out of the organic solvent, and is ready to be ingested.

     A.     The August 20, 2004 Search.

Mrs. Woods' activities on August 20, 2004, were not creating any risk to a juvenile. The presentence report indicates that Mrs. Woods' daughter Lacey, who was seventeen at the time, was put at risk by items found in Mrs. Woods' barn on August 20, 2004. As noted in paragraph 13 of

the report, when law enforcement arrived at Mrs. Woods' home to execute their warrant on August 20, 2004, Lacey was in the house. Lacey only went to the barn because the police had her take them there to find Mrs. Woods. When officers entered the lower level of the barn items used in the manufacture of methamphetamine were located in a back room. The presentence report finds that Lacey's presence in the lower level of the barn, outside the room in which the methamphetamine manufacturing materials were found, created a substantial risk to Lacey's life. A review of the items found in the barn refutes this finding.

The Pennsylvania State Police seized seven items from Mrs. Woods' barn on August 20, 2004. The seven items, as described by the Pennsylvania State Police, are as follows:

1. Plastic Container of Muriatic Acid, 1 Gallon, full, clear in color, markings "Sunnyside;"

2. Clear Glass Jar, 16 oz in size, half full with clear/amber liquid;

3. Clear Glass Drinking Jar, 1quart with white residue;

4. Rolled aluminum foil with salt approximately 6 inches in length;

5. Wooden/steel brush;

6. Stained paper towels, Kingsford lighter fluid containers, empty, small baby food jar;

7. White plastic ammonia container with house coming out of top, 64 oz in size, 10% full of a clear liquid with white residue on end of hose.

Defendant's Exhibit A.

According to police reports, and the affidavit in support of the search warrant obtained to seize the above listed items, item 2, the 16 ounce glass jar, had "smoke billowing out of it." The affidavit states that the Pennsylvania State Police Chemist present at the scene believed that the glass jar contained muriatic acid. That belief was wrong.

Laboratory testing revealed that the liquid in items 1 and 7 was hydrochloric acid, which is simply another name for muriatic acid. Defendant's Exhibit B. The white residue on the end of the hose of item 7 contained methamphetamine. Muriatic acid is sold over the counter for various household and industrial uses. It is sold in plastic containers because it is caustic and will react with metal. The clear layer of liquid in item 2 contained acetone. Acetone is an organic solvent used in a number of consumer items. Acetone is the main ingredient, sometimes the sole ingredient, in nail polish remover. The orange liquid in item 2 contained methamphetamine and hydriodic acid. The glass jar with white residue did not contain any controlled substance nor did the paper towels. The steel brush was not tested. Applying the four factors from application note 20 to these items shows that there was not a substantial risk to Lacey's life.

Initially, it is critical for the Court to understand that based upon the laboratory testing of the chemicals present in the 16 ounce glass jar, acetone, hydriodic acid, and methamphetamine, the liquid in the glass jar could not have been billowing smoke. At the sentencing hearing Mrs. Woods will present the testimony of Dr. Terry Martinez, a toxicologist and pharmacologist. Dr. Matinez' curriculum vite is attached as Defendant's Exhibit C. Dr. Martinez has testified and consulted in numerous criminal cases involving methamphetamine production. Dr. Martinez will explain that, based upon the State Police Crime Lab findings, the contents of the glass jar could not have been billowing smoke. Dr. Martinez will also testify that the bi-layer liquid consisting of a top layer of acetone and a bottom layer of hydriodic acid and methamphetamine would not spontaneously combust. He will further testify that the fumes from the acetone would not create a substantial risk of harm to Lacey's life.

Applying the first factor from application note 20, the quantity of chemicals or hazardous

materials, reveals that the amount of chemicals found was very small. The largest amount of chemicals found was the gallon of muriatic acid which was being stored in its approved container. Storing a gallon of muriatic acid in its approved container does not create **any** risk of harm, let alone create a risk of harm to a person's life. A trip to the Sherwin Williams store on 18th and Peach revealed multiple one gallon plastic containers of muriatic acid. The muriatic acid found in the plastic ammonia bottle was also properly stored. While the lid to this plastic bottle had a hose in it, this would not create a substantial risk of harm to anyone's life.

The total amount of acetone present is unknown. The acetone was in a 16-ounce glass jar that was half full of a clear/amber liquid which would mean that there was a total of eight ounces of combined liquid. There is no indication as to how much of the total liquid was made up of the clear liquid and how much of the total liquid was made up of the amber liquid. Furthermore, the lab report from the Pennsylvania State Police Crime lab does not quantify how much of the total liquid was made up of the clear versus the amber liquid. Even if **all** of the liquid was acetone, that would only amount to 185.15 grams of acetone. The calculation is as follows: 8 ounces x 29.57 (there are 29.57 milliliters in a fluid ounce) = 236 milliliters. To put that in perspective, a 20-fluid ounce bottle of soda contains **591** milliliters of soda so there was less than half of a soda bottle of acetone present. There are .78454 grams of acetone per milliliter, Defendant's Exhibit D, so even if all of the liquid in item 2 was acetone, which it was not, there would have only been 185.15 grams of acetone (236 milliliters x .78454 = 185.15 grams) present. Of course the liquid in item 2 was not all acetone so that actual amount of acetone was considerably less than 236 milliliters. No matter which way you look at item 2, it contained a tiny amount of acetone. The acetone was not in its original container, however, due to the extremely small amount of acetone this is not a fact

8

of consequence. Any one who has been in the same room as a woman using nail polish remover (acetone) knows that acetone does have an unpleasant smell, but in small amounts the vapors are not harmful. Dr. Martinez will testify concerning the lack of danger from the acetone fumes. And, while acetone is flammable, that does not translate into a finding that the presence of a small amount of acetone that is contained in an area with no heat source or flame causes a substantial risk to the life of a minor.

The amount of methamphetamine and hydriodic acid is also unknown as the lab report does not quantify the amount of methamphetamine and hydriodic acid. Again, however, the total amount of the amber liquid and clear liquid was less than half of a 20-ounce bottle of soda. It is likely that the amber liquid represented the mixture of water, hydriodic acid, and methamphetamine left after the ephedrine was cooked with red phosphorus and iodine at some earlier time and place. If that was the case, most of the amber liquid was probably water. In any case, the methamphetamine did not present a danger to anyone, and neither did the hydriodic acid.

Applying the second factor from application note 20 is of no real use as there is no evidence concerning the manner in which hazardous or toxic substances were disposed. As far as the likelihood of release into the environment of hazardous or toxic substances, that likelihood was minimal. The bulk of the chemicals found were being stored in an environmentally safe manner. The acetone and hydriodic acid present were minuscule.

The duration of the offense was extremely short. On August 17, 2004, three days before the August 20, 2004 search, the same State Police troopers had searched the barn and found no evidence of recent methamphetamine production. Accordingly, the evidence shows that the methamphetamine production had been occurring for, at most, a three-day period.

Finally, the location of the laboratory, if a couple of glass jars and plastic jugs can be called a laboratory, was a barn located in a remote, rural area. This fact strongly weighs in favor of finding that the chemicals did not present a substantial risk of harm to the life of Lacey Woods.

B.   The October 20, 2004 Search

The October 20, 2004 search of Mrs. Woods' home resulted in the seizure of 45 items. The presentence report focuses primarily on seven glass jars containing various liquids including iodine, methamphetamine, naphtha, and hydriodic acid. The addendum also lists cans of acetone and a glass beaker with a stopper that contained hydrochloric acid (muriatic acid) as causing a danger. The presentence report fails to examine the amount of chemicals contained in the seven glass jars. Rather, the report appears to rest on the premises that the presents of these chemicals in any amount created a substantial risk of harm to the life of Jasmine Woods. This analysis does not comport with the requirements of application note 20 and should therefore be rejected.

The seven glass jars were identified by the State Police as items 1 through 7. See Defendant's Exhibit E. The lab report refers to the liquid taken from the jars as items 1.1 through 1.7. See Defendant's Exhibit F. The clan lab inventory sheet for item 1 indicates that it was a 72 ounce glass jar which was full of a brown liquid. Defendant's Exhibit E. The lab report indicates that the brown liquid, which it describes as orange liquid and red colored sludge, weighed 4,283 grams and contained iodine and methamphetamine. However, the lab report does not indicate how much iodine or methamphetamine was contained in the liquid. The liquid was tested using a gas chromatograph/mass spectrometer (GC/MS). This machine identifies the composition of a physical sample by the mass of one or more elements in the sample. Http://en.wikipedia.org/wiki/Mass_spectrometer. Dr. Martinez will explain that the GC/MS is very

good at detecting the presence of even tiny amounts of elements within a sample. The GC/MS does not identify the quantity of a particular element in a compound, only its presence. Accordingly, the lab report in this case does not allow us to know how much iodine or methamphetamine was in the 4,283 grams of liquid. For all we know, the bulk of the liquid may be water with only trace amounts of iodine and methamphetamine present. This is almost certainly the case as the chemist did not attempt to determine the amount of methamphetamine present in this item as he did with respect to the other two jars that contained methamphetamine.

The second jar, item 2 on the clan lab inventory sheets, contained 32 ounces of a clear amber liquid. Defendant's Exhibit E. The lab report describes liquid in item 2 as a "clear amber liquid w/small amount of red liquid" and states that the top layer weighed 957 grams and contained naphtha. Defendant's Exhibit F. It is not possible that the entire 957 grams of the top layer was naphtha because 32 fluid ounces equals 946.24 milliliters (32 x 29.57) and a milliliter of naphtha equals .66477 grams, Defendant's Exhibit D, so that even if all of the contents of item 1.2 was naphtha the most it should weigh is 629 grams (946.24 x .66477). Of course, the entire amount of the liquid in item 1.2 was not naphtha, as the lab report states that the bottom layer contained hydrochloric acid and methamphetamine in undetermined amounts.

The third jar, item 1.3, contained a red orange liquid that weighted 530 grams and contained methamphetamine. Again, the amount of methamphetamine is not determined nor is the identity of the liquid itself identified.

The fourth jar, item 4 on the clan lab inventory sheets, and item 1.4 on the lab report, was 12 ounces of a bi-level liquid. The top layer weighed a total of 233.4 grams and contained both methamphetamine and naphtha. The chemist actually gassed a 15 gram sample of this mixture with

hydrochloric gas and determined that the total amount of methamphetamine contained in the top layer of liquid was 3.73 grams. The bottom layer weighed 85.10 grams and apparently did not contain any controlled substance or chemical. Again, it is not possible that the 229.67 grams left in the top layer after the 3.73 grams of methamphetamine were extracted was solely naphtha. The calculations are as follows 12 ounces x 29.57 ml = 354 ml x .66477 grams = 235.9 grams. Put another way, if the entire amount of the liquid in item 1.4 was naphtha it would have a total weight of 235.9 grams. But we know the entire 12 ounces was not naphtha as the lab report states that the bottom layer of the liquid weighed 85.10 grams and there was 3.73 grams of methamphetamine in the top layer. So, at the end of the analysis it is unclear how much naphtha was in item 1.4.

      The fifth jar, item 1.5, was about 32 ounces, or 946.24 milliliters, of an orange liquid with a red substance. The lab report indicates that 21.3 grams of the liquid was naphtha but it is not clear how this weight was reached.

      The sixth jar, item 1.6, was about 9 ounces of clear amber liquid. The lab report indicates that the top layer of this liquid weighed 26.31 grams and contained methamphetamine and naphtha. This is somewhat puzzling as the "Clan Lab Inventory" sheet for item 6 does not identify the item as a bi-layer liquid. Be that as it may, the lab reports indicates that by gassing the 26.31 gram mixture of methamphetamine and naphtha the chemist determined that the liquid contained .57 grams of methamphetamine. It is not clear if all of the remaining 25.74 grams was naphtha.

      The seventh jar, item 1.7, contained about 7.5 ounces of a pink/orange bi-layer liquid. According to the lab report, the top layer contained 23.56 grams of naphtha and the bottom layer weighed 11.55 grams and contained some amount of methamphetamine. Again, it is unclear how the chemist determined there to be 23.56 grams of naphtha.

As explained above, we do not really know how much naphtha was present in items 1.1 through 1.7. Even viewing the evidence in the light most favorable to the government, the total amount of naphtha was 1,257.27 grams which equals 1,891.29 milliliters. There are 3,780 milliliters in a gallon, U.S.S.G. § 2D1.1 application note 10, so best case scenario for the government, Mrs. Woods possessed a little over a third of a gallon of naphtha. Of course, we know that number has to be lower based upon the weight of naphtha as discussed above. So in reality, Mrs. Woods probably possessed less than a third of a gallon of naphtha. Just as with the acetone in the August 20, 2004 search, no matter which way you look at the amount of naphtha found on October 20, 2004, it can only be described as a small amount.

The presentence report also points to acetone and hydrochloric (muriatic) acid that was found as creating a serious risk of harm to Jasmine. However, the acetone was in its approved container and was not a threat at all. The hydrochloric (muriatic) acid was in a 500 milliliter glass flask with a stopper. Defendant's Exhibit F. This is an entirely safe way to store hydrochloric acid because the acid will not react with glass as it will with metal and the stopper prevents any fumes from emanating from the acid. Furthermore, there was only one milliliter of acid in the flask which is a tiny amount.

At the end of the day, there was a very small amount of chemicals found in Mrs. Woods' home on October 20, 2004. Some of the chemicals, the acetone and hydrochloric acid, were being stored safely. The naphtha contained in the various glass jars was not in approved containers, however the small amount of naphtha makes the overall risk presented by the naphtha very low.

As with the August 20, 2004 search, there is no evidence concerning how Mrs. Woods disposed of hazardous or toxic substances. Based on the items found during the October 20, 2004

search, there was not a likelihood of release into the environment of any hazardous or toxic substance. The only possible release in this case would be fumes from naphtha but people use naphtha every day for general cleaning purposes which results in some fumes being dispersed. There is no evidence that the naphtha in this case created a serious risk to the environment.

The duration of the offense was limited. The CI for the October search, Jeffrey Roydes, indicated that Mrs. Woods had been cooking methamphetamine for "some time" but only gave details about seeing methamphetamine manufacturing on October 17 and 19, 2004.

Finally, while the location of the "lab" was Mrs. Woods' home, there is no evidence that Mrs. Woods actively manufactured methamphetamine when Jasmine was present. The presentence report claims Roydes stated that he cooperated against Mrs. Woods because he thought it was wrong for Mrs. Woods' youngest child to be exposed to methamphetamine. This topic was the subject of testimony at the suppression hearing before this Court. In this Court's Memorandum Opinion denying the motion to suppress, the Court found that Roydes told Titusville police that the reason he was providing information about Mrs. Woods was because he was concerned "with the safety of [Mrs.] Woods' daughter **Lacey**." Docket No. 29 p. 3 (emphasis added). Lacey turned 18 on September 3, 2004.

The presentence report claims that Jasmine was put at risk by the presence of the chemicals contained in the glass jars in the upstairs bedroom. At the time of the search, Jasmine was asleep downstairs, well away from the chemicals upstairs. Furthermore, Mrs. Woods will present medical records at the hearing showing that after the search on October 20, 2004, Jasmine was taken to a local hospital where tests were performed to determine if she had been exposed to any hazardous materials and that the results of those tests were negative.

Applying the four factors set forth in application note 20 to §2D1.1, a 6-level increase is not supported by the facts of this case. Accordingly, Mrs. Woods' total offense level should be 25. An offense level of 25 with a criminal history category I results in an advisory guideline imprisonment range of 57-71 months.

Mrs. Woods has never been to prison before. The only conviction she suffered before this offense was for attempting to obtain Oxycotin by using an altered prescription. Mrs. Woods served six months of probation for that offense. So, the first term of imprisonment Mrs. Woods is facing in her life is five to six years long. That is a long sentence for anyone, but especially for a person who has never before been to jail. Mrs. Woods' letter to the Court acknowledges the terrible decisions she has made for herself and her family as a result of her drug addiction. The letter offers some hope, however, as it shows that Mrs. Woods recognizes the extent of her addiction and the price she, and her family is paying for that addiction. It's unfortunate that it took jail to open her eyes. A sentence of 57 months is sufficient in this case to punish Mrs. Woods for her crimes.

WHEREFORE, defendant, Lynda Lorraine Woods, respectfully requests that this Honorable Court find that her total offense level is 25 with a criminal history category of I resulting in an advisory guideline imprisonment range of 57-71 months.

Respectfully submitted,

/s/ Thomas W. Patton
Thomas W. Patton
Assistant Federal Public Defender
PA I.D. No. 88653