IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.  ) | Criminal No. 04-54 Erie |
| ) | |
| LYNDA LORRAINE WOODS ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
POSITION WITH RESPECT TO SENTENCING FACTORS**

AND NOW comes the United States of America, by its attorneys, Mary Beth Buchanan, United States Attorney for the Western District of Pennsylvania, and Christian A. Trabold, Assistant United States Attorney for said district, and avers as follows:

Woods argues that the presentence report incorrectly increases her base offense level six (6) levels pursuant to U.S.S.G. § 2D1.1(b)(6)(C) for creating a substantial risk of harm to the life of a minor. She claims that her conduct created no such risk. Woods is mistaken.

Application Note 20 to U.S.S.G. § 2D1.1 instructs the Court to consider four factors when examining whether the manufacture of methamphetamine created a substantial risk of harm to the life of a minor. Those factors are:

(i)   The quantity of any chemicals or hazardous or toxic substances found at the laboratory, and the manner in which the chemicals or substances were stored.

(ii)  The manner in which hazardous or toxic substances were disposed, and the likelihood of release into the environment of hazardous or toxic substances.

>    (iii)   The duration of the offense and the extent of the manufacturing operation.
>
>    (iv)    The location of the laboratory (e.g., whether the laboratory is located in a residential neighborhood or a remote area), and the number of human lives placed at substantial risk of harm.

The guideline provision at issue here, U.S.S.G. § 2D1.1(b)(6)(C) was originally created as emergency amendment 608 to the Sentencing Guidelines, effective December 16, 2000.[1]  The amendment was the Sentencing Commissions response to Congress' directives in the Methamphetamine and Club Drug Anti-Proliferation Act of 2000, H.R. Rep. 106-878, dated September 21, 2000 and the subsequently promulgated Methamphetamine Anti-Proliferation Act of 2000, Pub.L.No. 106-310, 114 Stat. 1101, enacted on October 17, 2000.  The Methamphetamine Anti-Proliferation Act was devised to halt the "methamphetamine epidemic in America." United States v. Layne, 324 F.3d 464, 468 (6th Cir. 2003)(citation omitted).  The Sixth Circuit in Layne also noted the House of Representatives explanation of the hazards associated with the "dangerous manufacturing process" for methamphetamine as follows:

> [M]ethamphetamine can be made from readily available and legal chemicals and substances, and ... it poses serious dangers to both human life and to the environment ... these chemicals and substances are utilized in a manufacturing process that is unstable, volatile and highly combustible.  Even small amounts of these

---

[1] When originally promulgated in amendment 608, the current U.S.S.G. § 2D1.1(b)(6)(C) was located at U.S.S.G. § 2D1.1(b)(6)(B).  Subsequent amendment has merely moved the section to its current location without a change in language.

>chemicals, when mixed improperly, can cause explosions and fires. For every one pound of methamphetamine that is produced, approximately five pounds of toxic and often lethal waste products may be left behind at the laboratory site, or disposed of in rivers, kitchen sinks or sewage systems in an effort to conceal evidence of illegal manufacturing. More disturbing is that most of these residences are situated in residences, motels, trailers, and vans, and often times are operated in the presence of children.

Layne, 324 F.3d at 468-69 (citation omitted); See United States v. Dick, 173 F.Supp.2d 765, 769 (E.D. Tenn. 2001).

In Layne, the Sixth Circuit was faced with the question of whether the defendant's methamphetamine manufacturing operation created a substantial risk of harm to human life under what was then U.S.S.G. § 2D1.1(b)(6)(A), which is now found at U.S.S.G. § 2D1.1(b)(6)(B). In analyzing the "substantial risk of harm" issue, the Layne court relied upon the four factors currently enumerated in Application Note 20 to U.S.S.G. § 2D1.1. That analysis is helpful here because those are the same factors that this Court must examine in determining whether Woods created a substantial risk of harm to the life of a minor.

In examining the four relevant factors, the Layne court noted that:

>Defendants admitted to manufacturing methamphetamine. The ephedrine reduction method used by Defendants requires a source of heat and a series of chemical reactions. Certain of the chemicals used in the process are toxic and inherently dangerous. During the manufacturing process, some of these chemicals, which are highly flammable, present a threat of explosion. These chemicals pose an additional risk should anything go wrong during the manufacturing process. The process

> produces toxic gases, which pose a serious risk to those who inhale them, and other dangerous byproducts.
>
> Numerous hazardous and toxic substances and chemicals were recovered from Dick's apartment.  The search turned up a gallon of muriatic acid, a number of jars of clear and two-layered liquids, tubing that suggested Defendants were attempting to produce hydrogen gas, materials containing red phosphorous residue, empty gallon containers for acetone and Coleman fuel, two or three ounces of crystal iodine, and objects with white residue believed to be methamphetamine.
>
> Acetone, Coleman fuel, and red phosphorous are flammable and can be explosive.  Muriatic gas is a toxin that can cause severe burns.  Crystalized iodine is hazardous. Many of these chemicals emit dangerous fumes and vapors. The byproduct of the process includes highly flammable and explosive phosphine gas.  In this case, the law enforcement officers conducting the search smelled chemicals when they entered Dick's apartment.  Neighbors also complained that they smelled odors similar to "nail polish," which was likely the smell of acetone.
>
> The quantity of these chemicals was the amount necessary to manufacture a couple of ounces of methamphetamine. These chemicals, some of which had already been used and others which were being used in the cooking process, were not stored.  Rather, the chemical containers, some full and some empty, were found throughout Dick's apartment. Although these chemicals are probably typical of those used in indoor methamphetamine labs, the inherent danger of the chemicals found in Dick's apartment militates in favor of applying § 2D1.1(b)(6)(A).

Layne, 324 F.3d at 470.  Second, the Layne court found that there was insufficient evidence to conclude that the defendants disposed of items in a manner harmful to the environment. Third, the court found that the defendants had been operating their methamphetamine operation for at least two weeks and possibly several weeks.  The court found that this weighed against the defendants.  Fourth, the

4

court noted that the methamphetamine lab was located in the defendants' apartment, which was part of a large apartment complex in a densely populated area. This strongly militated in favor of applying the sentencing enhancement. Finally, and perhaps most significantly, the court reasoned that the defendants' "use of methamphetamine while they manufactured it clearly heightened the risk of danger posed by the operation, given the highly explosive and toxic materials involved." Id. at 471; Dick, 173 F.Supp.2d at 771. This factor "strongly militates in favor of application of § 2D1.1." Id. Considering all of the factors together the Layne court affirmed the district court's enhancement of defendants' sentences for creating a substantial risk of harm.

The Sixth Circuit also affirmed a six level increase for substantial risk of harm to the life of a minor from methamphetamine production in United States v. Bivens, 129 Fed. Appx. 159, 163-65 (6th Cir. 2005). In affirming the enhancement, the Bivens court noted that the Sentencing Guidelines do not require the sentencing court to find that a minor was actually harmed, only that the life of a minor was placed at substantial risk of harm. Id. at 165. Moreover, the Sixth Circuit emphasized again that a defendant's addiction to methamphetamine is properly considered in the substantial risk of harm analysis. Id.

Here, applying the four factors enumerated in Application Note 20 to Woods' conduct leads to the inescapable conclusion that

her offense level should be increased by six levels for creating a substantial risk of harm to the life of a minor.  Prior to a consideration of the four factors, the Court should be mindful that Woods has pleaded guilty to manufacturing methamphetamine from August 2004 to October 2004.  Further, it is not in dispute that Jasmine Woods, who was then eleven years of age, was present in the Woods residence on October 20, 2004, when the Woods residence was searched and a methamphetamine lab was located.

### I.   Quantity and Storage of Chemicals

The government intends to introduce into evidence at time of sentencing photographs taken by law enforcement personnel during the October 20, 2004, search of the Woods residence.[2]  The photos reveal a scene of astonishing squalor.  Pictured in the photos is the location of Woods' methamphetamine lab in an upstairs bedroom in the residence.  Numerous jars and containers of hazardous chemicals and toxic substances can be clearly seen throughout the bedroom in which the lab was located.  The chemicals and toxins are not properly stored.  Rather, the substances are merely left on the

---

[2] The government concedes that the August 20, 2004, incident, in and of itself, is not sufficient to justify the six level enhancement at issue. Nevertheless, that incident should still be taken into consideration as it relates to the length of time Woods was manufacturing methamphetamine and the cumulative impact on the environment from such repeated methamphetamine production.  Moreover, the Pennsylvania State Police report of Trooper William McClellan covering the August 20, 2004 search reveals that Woods' relative, Colleen Dooley, informed Trooper McClellan that her eight year old son and her fiancé's eleven year old son had been playing in the barn where the methamphetamine equipment was located the morning of August 20, 2004. Likewise, Woods then seventeen year old daughter, Lacey, and then eleven year old daughter, Jasmine, were present when the officers arrived on August 20, 2004.

floor or in areas plainly accessible to children. The hazardous substances are primarily in glass or other similarly breakable containers, with no lids. This failure to properly store the materials is especially harmful because it dramatically increases the possibility of spillage, exposure and the spreading of dangerous fumes and vapors. Perilous, highly flammable chemicals can be seen in close proximity to torches and stoves. A garden hose, used to disperse the gases produced from a methamphetamine cook, was observed going from the immediate location of the lab to a bag of kitty litter in the same upstairs bedroom. Chemical cans and mason jars can be seen strewn on a bed in an upstairs bedroom. A plastic garbage filled with several thousand matches, was located in an upstairs bedroom. The slightest spark would have turned this bag into an inferno that would have incinerated the chemical and garbage strewn Woods residence very quickly. Numerous other torn apart match books were observed in the residence. The matches were present in the residence as a source of red phosphorous used in the methamphetamine production process Woods was utilizing.

    **II.** **Manner of Chemical Disposal and Environmental Impact**.

The photographs taken of the Woods property reveal a massive garbage burn pile which contains chemical type cans that are burned. Numerous matches can also be seen inside the garbage pile. Moreover, the photos taken the night of October 20, 2004, reveal a garden hose emanating from the methamphetamine lab and

7

traveling to a bag of kitty litter inside the bedroom. There is also a separate garden hose in an upstairs window of the Woods residence. This garden hose set up is a common means for dispersing the gases produced by cooking methamphetamine and is indicative of an environmental hazard here. The noxious fumes emanating from methamphetamine production are extremely dangerous. The garden hose to the kitty litter and out the window is evidence of Woods' disregard for not only the environment but also the safety of anyone who may have unfortunately come into contact with these poison gases, including her own family members.

### III. Duration and Extent of Manufacturing Operation

Woods has pleaded guilty to manufacturing methamphetamine from August 2004 to October 2004. It is obvious from a review of the pictures that Woods manufactured methamphetamine on multiple occasions in the upstairs bedroom where the lab was found on October 20, 2004. The dresser where the cooking occurred is covered in chemicals and markings indicative of past methamphetamine production. There are thousands of matches present in the residence. Chemicals of various types and representing various stages of the production process are present. Woods also had a large quantity of pseudoephedrine in the process of being broken down, plainly in preparation for future production. Woods had fashioned a fume siphoning apparatus by running a garden hose into a bag of kitty litter. The physical evidence at the Woods'

residence on October 20, 2004, leads to the inescapable conclusion that Woods had been making methamphetamine for a long time prior to the arrival of law enforcement.

Further, Jeff Roydes, whose information played a significant role in the procurement of the October 20, 2004, search warrant, informed law enforcement that Woods had been making methamphetamine for some time. Roydes said that he had witnessed Woods make methamphetamine on October 17 and 19, 2004. He also revealed that Woods would cook methamphetamine three to four times a week and would cook after 9:00 PM because she believed the police could not search after this time. Roydes also disclosed that each cook yielded ten to twenty grams of methamphetamine. Thus, it is apparent from Woods' guilty plea and the facts present in August and October 2004 that Woods was actively making large amounts of methamphetamine over an extended time period and would surely have continued doing so had she not been stopped on October 20, 2004.

### IV. Location of the Laboratory and Number of Lives Placed at Risk

It is apparent that the Woods residence is not in a densely populated area, such as an apartment complex or tightly packed neighborhood. Nevertheless, Woods' conduct endangered multiple people including her two daughters, Jeff Roydes and Jesse Spangler, who was present in the house when law enforcement arrived on October 20, 2004. In United States v. Skelton, 101 Fed. Appx. 89, 91 (6th Cir. 2004), the Sixth Circuit affirmed the district

court's six level enhancement for creating a substantial risk of harm to the life of a minor. The Court, in holding that the enhancement was properly applied included the following commentary from the district court:

> [a]nd even though it was in a remote area, I don't think that carries the day because the harm here was not to other people in the surrounding area, but to the infant who resided in the household.

Id. at 91. The same logic applies here. The harm to Jasmine Woods was substantial and direct and cannot be disregarded merely because the Woods family lived in a rural location.

Lastly, the foregoing cases strongly encourage the consideration of Woods' serious addiction to methamphetamine when analyzing the applicability of the substantial risk enhancement. The presentence report includes Woods' admission that she abused methamphetamine for approximately a year. Other factors starkly reveal that Woods' life and judgement had been overtaken by methamphetamine to the detriment of those around her. When law enforcement arrived at the Woods property in August 2004 they were stunned by the deplorable condition of her animals. Yet Woods adamantly maintained that she was taking proper care of them, despite their obvious condition and the death of one of her horses. Likewise, even a cursory review of the pictures of the Woods residence on October 20, 2004, reveals extremely deplorable living conditions. Plainly, all that mattered to Woods at that point was

methamphetamine. Woods' repeated abuse of methamphetamine and related loss of judgement dramatically increased the risks and dangers associated with methamphetamine production. Those risks and dangers are high even for someone who is not an addict. When extreme addiction is thrown into the equation the risks and dangers increase exponentially. Thus, when the totality of the circumstances is considered, Woods' conduct created a substantial risk to the life of her minor daughter.

The primary problem with Woods' argument against the enhancement is her refusal to consider all of the factors as they impact upon one another under the totality of circumstances. The facts in this case cannot be parsed out and considered in isolation. The proper analysis cannot be limited to toxicology or chemistry. Rather, one must look to all of the dangers posed by the chemicals, substances and items present in the Woods residence and how those dangers could spark other problems. For example, many of the chemicals found are highly flammable, that risk is greatly increased if those chemicals were found in close proximity to thousands of matches. Chemicals which may be innocuous if stored properly become highly dangerous if stored on the floor in open containers. The risk increases the longer the conduct continues. The risk also increases if someone with an uncontrollable appetite for methamphetamine is doing the cooking. In short, when all of the factors are considered together the only

conclusion is that Woods created a substantial risk to the life of her minor daughter.

                                    Respectfully submitted,

                                    MARY BETH BUCHANAN
                                    United States Attorney

                                    <u>s/Christian A. Trabold</u>
                                    CHRISTIAN A. TRABOLD
                                    Assistant U.S. Attorney
                                    PA ID No. 75013