IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA

v.                      CRIMINAL NO. 04-54 ERIE

LYNDA LORRAINE WOODS


HEARING ON DEFENDANT'S MOTION TO SUPPRESS


Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Wednesday, May 25, 2005.


APPEARANCES:
        CHRISTIAN A. TRABOLD, Assistant United States
        Attorney, appearing on behalf of the Government.

        THOMAS W. PATTON, Assistant Federal Public
        Defender, appearing on behalf of the Defendant.

Ronald J. Bench, RMR - Official Court Reporter

2

1                    I N D E X

2

3     WITNESSES:             DIRECT  CROSS  REDIRECT  RECROSS

4   FOR THE DEFENSE:

5   Clarence Peterson           8     20     30       37

6   Jeffrey Roydes             38     49     57       --

7

8   FOR THE GOVERNMENT:

9   Robert Golenberke          60     64     70       73

10

11

12            - - -

13

| | EXHIBITS: | IDENTIFIED | ADMITTED |
|---|---|---|---|
| 14 | | | |
| 15 | FOR THE DEFENSE: | | |
| 16 | Defendant's Exhibit C | 10 | -- |
| 17 | Defendant's Exhibit K | 33 | -- |
| 18 | Defendant's Exhibit I | 40 | -- |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | - - - | | |

3

1          P R O C E E D I N G S

2

3          (Whereupon, the proceedings began at 9:33 a.m., on

4    Wednesday, May 25, 2005, in Courtroom C.)

5

6          THE COURT:  This is the time that we set for a

7    suppression hearing in the case of United States versus Lynda

8   Lorraine Woods.  And we did have an opportunity to briefly talk

9   about some of the issues that are driving this motion a few

10  days ago.  Are you ready to go?

11          MR. PATTON:  Yes, your Honor.

12          THE COURT:  All right.

13          MR. TRABOLD:  Your Honor, if I could just put

14  something on the record before we start?

15          THE COURT:  Sure.

16          MR. TRABOLD:  The government anticipates that

17  counsel, and I think what counsel anticipates is that we will

18  essentially be having a Franks hearing in this case.  At least
                          _____

19  relative to what occurred on October 20th.  It's the

20  government's position that counsel has not made the necessary

21  showing in the pleadings to justify a Franks hearing because
                                          _____

22  neither of the two-pronged tests have been met in this case.

23          THE COURT:  Reckless omission and materiality?

24          MR. TRABOLD:  Correct.  Having failed to meet that

25  standard, counsel then is not entitled to call a government

4

1  witness and question them relative to the issues that are

2  presented at a Franks hearing.  That's our position.  Our
          ———————

3  position is, essentially, having to failed to make that

4  necessary showing under Franks, then your decision is really
          ———————

5  based on what's in the affidavit and nothing else.

6          THE COURT:  All right.  What do you have to say

7  about that?

8          MR. PATTON:  Your Honor, we have made a sufficient

9  showing as to a material omission and materiality.

10          THE COURT:  If I could interrupt you just for a

11  second and make sure we're talking about the same omissions or

12  misstatements that would form it.  As I understand it, would it

13  essentially be the following, Mr. Patton, and I'm talking about

14  the October search warrant, obviously, for the October 20th

15  search.  That the CI had a motive to lie.  That the CI had, I'm

16  paraphrasing here, but had defrauded the police on previous

17  occasions in connection with his activities, in terms of giving

18  them fake drugs and withholding money and that type of thing.

19  And in that he had not supplied confidential information in a

20  classic sense, not only on the other cases, plural, but the

21  information he supplied was information about himself in the

22    course of a criminal trial that the police already knew.  Is

23    that essentially the material information?

24          MR. PATTON:  Yes.

25          THE COURT:  All right.  And Mr. Trabold said you

5

1    haven't raised a triable issue on it, so why don't you address

2    that point?

3          MR. PATTON:  Sure.  Your Honor, the Third Circuit

4    has defined a material omission or a material misstatement as

5    follows.  It said that "omissions are made with reckless

6    disregard for the truth when an officer recklessly omits facts

7    that any reasonable person know that a judge would want to

8    know; and assertions are made with reckless disregard for the

9    truth when an officer has obvious reasons to doubt the truth of

10    what he or she is asserting."  That's from Wilson_v._Russo,
                                              ——————— —— ——————

11    212 F.3d 781 at 783 (3rd Cir. 2000).  In this case the attempt

12    to establish the credibility of the confidential informant for

13    the October search was done by inserting in the affidavit that

14    Mr. Roydes had proven to be a reliable source of information in

15   the past, and that Mr. Roydes previously had been a witness for

16   the Attorney General's Office in narcotics cases in the past.

17   And, specifically, it says he/she was a witness for the

18   Attorney General's Office in the prosecution of drug cases,

19   plural.

20        Number one, the evidence, I believe, will show that

21   we have made a substantial preliminary showing based on Mr.

22   Roydes' affidavit that prior to Mr. Roydes providing

23   information with regard to this October 20th search warrant, he

24   had only provided information or assisted with law enforcement

25   on one prior occasion.  That prior occasion consisted of Mr.


6


1   Roydes' testimony in the case of Fred Perry, who actually was a

2   co-defendant of Mr. Roydes.  And that Mr. Roydes' testimony

3   concerned two controlled buys that state police had made off of

4   Mr. Roydes.  And on one of the controlled buys, the state

5   police troopers had seen that Mr. Roydes had obtained the

6   methamphetamine from Mr. Perry and that Mr. Roydes then

7   provided the methamphetamine to the state police after Mr.

8   Perry had taken some of the methamphetamine out for his

9    personal use.

10         And that it was either known or should have been

11   known to Officer Peterson, who was doing the affidavit, that

12   Mr. Roydes had one prior instance of cooperation.  That

13   instance of cooperation simply referred to Mr. Roydes

14   testifying about controlled buys being made off of him and that

15   not putting that information into the affidavit was a material

16   omission because that would been very revealing to the judge

17   who was trying to decide whether Roydes was reliable.  Because

18   it indicated that Roydes had not provided any information about

19   anyone else, he had simply provided confirmed information that

20   the police already knew about Roydes own illegal activity.

21         It also goes to flushing out Officer Peterson's

22   claim that Roydes had proven to be a reliable source of

23   information.  That any reasonable judicial officer would have

24   wanted to know that Roydes only prior instance of providing

25   information was simply Roydes confirming information about

7

1    himself that the police obviously already knew because the

2    police would ultimately make a buy off of him.

3          THE COURT:  Let me ask you this, and then we'll get

4    moving here.  For purposes of our get-together today, it seems

5    to me that you have all your suppression eggs in a Franks
                              ———————

6    basket, in that -- well, you're shaking your head no, but are

7    you telling me, assuming -- looking at the affidavit as it

8    presently stands, just facially under a Gates analysis, is it
                              ——————

9    your position that quite independent of any Franks issues, it
                              ———————

10   is facially inadequate?

11         MR. PATTON:  Yes, and we specifically made that

12   point both in the original motion and in our reply to the

13   government's response.

14         THE COURT:  Yes, I know you did.  Is there anything

15   else you want to tell me about Franks?
                              ———————

16         MR. PATTON:  No, your Honor, I think we made our

17   statement.

18         THE COURT:  I think there has been a sufficient

19   minimum showing that the issue is appropriately joined, so I'm

20   going to take testimony on the issue.  All right, are we ready

21   to go then?

22         MR. PATTON:  Yes, your Honor.  I would call Officer

23  Clarence Peterson.

24        THE COURT:  Okay.  Officer, come on up here, give

25  your name to my court reporter, then I'll swear you in.


                                    8


1        THE WITNESS:  Officer Clarence Peterson,

2  P-e-t-e-r-s-o-n.

3              CLARENCE PETERSON, DEFENSE WITNESS, SWORN

4                    DIRECT EXAMINATION

5  BY MR. PATTON:

6  Q.    Tell us your name, please, sir?

7  A.    My name is Clarence L. Peterson.

8  Q.    And, Mr. Peterson, where do you work?

9  A.    For the City of Titusville Police Department.

10  Q.    Are you a police officer there?

11  A.    Yes, I am.

12  Q.    How long have you had that job?

13  A.    Totally I've been a police officer seven years.

14  Q.    All seven of those years have been with Titusville?

15  A.    No, they haven't.

16  Q.    How long have you been with the Titusville Police

17    Department?

18    A.    For three years.

19    Q.    Where were you employed before that?

20    A.    Borough of Union City.

21    Q.    How long were you with Union City?

22    A.    For four years.

23    Q.    Was your employment with Union City as a full-time police

24    officer?

25    A.    Actually, no, sir, part-time.

9

1         THE COURT:  Keep your voice up, sir.

2    BY MR. PATTON:

3    Q.    So your employment with Union City was as a part-time

4    police officer?

5    A.    Yes, it was.

6    Q.    When did you start working for Titusville, approximately?

7    A.    I believe it was February of 2001.

8    Q.    Were you full-time with Titusville or part-time?

9    A.    Full-time.

10    Q.    What were your duties there with the Titusville Police

11  Department?

12  A.    Pardon me.

13  Q.    What were your duties or what are your duties with the

14  Titusville Police Department?

15  A.    I'm a police officer, I'm a K-9 officer and I'm also a

16  member of the Attorney General's drug task force.

17  Q.    How long have you been with the task force?

18  A.    Almost two years.

19  Q.    In October of last year, October of 2004, did you prepare

20  an application for a search warrant for the residence of Lynda

21  Woods?

22  A.    Yes, I did.

23        MR. PATTON:  May I approach, your Honor.

24        THE COURT:  Yes.

25  BY MR. PATTON:


                                10


1  Q.    Mr. Peterson, I'm showing you Defendant's Exhibit C and

2  ask you to take a look at that, please?

3        MR. PATTON:  Your Honor, my defense exhibits

4  correspond to, they're the same exhibits that are attached to

5    my motion to suppress.

6           THE COURT:  Was this exhibit marked as Exhibit C in

7    the motion to suppress?

8           MR. PATTON:  Yes.

9           THE COURT:  We're not going to have any new exhibits

10   to take, they're already part of the record?

11          MR. PATTON:  Correct.

12          THE COURT:  All right.

13   BY MR. PATTON:

14   Q.    You can keep that one, sir.  Is Defendant's Exhibit C the

15   search warrant that you prepared on October 20, 2004, for Mrs.

16   Woods' house?

17   A.    Yes, it is.

18   Q.    Your affidavit for that warrant refers to a confidential

19   informant, is that correct?

20   A.    Yes, it does.

21   Q.    Who was the confidential informant?

22   A.    Jeffrey Roydes.

23   Q.    Prior to October 20, 2004, had you ever met Mr. Roydes?

24   A.    Yes, I have.

25   Q.    How had you met him?

11

1  A.    Just through incidents where Mr. Roydes was there or

2  involved.

3  Q.    Had you ever used him as a source of information prior

4  to --

5  A.    I personally had not.

6  Q.    At the time you began speaking with Mr. Roydes on October

7  20, 2004, did you have any personal knowledge of any time that

8  Mr. Roydes may have acted as a source of information for law

9  enforcement?

10  A.    Yes, I did.

11  Q.    What was that knowledge?

12  A.    It was on prior drug cases.  A lot of the information

13  came from Robert Golenberke, who was a supervisor of the

14  Attorney General's task force.

15         THE COURT:  Officer Peterson, I'm having one heck of

16  a time, maybe it's just me, but you've got to speak up, like

17  you're out on the street, all right.  Start that all over

18  again.

19         THE WITNESS:  A lot of the information that I had

20  from Mr. Roydes came from Robert Golenberke, a supervisor for

21  the Attorney General's drug task force.  He had been involved

22  with Roydes in at least two or three other incidents where Mr.

23  Roydes had testified for him.

24      THE COURT:  Spell his last name, if you can, Robert

25  who?

12

1       THE WITNESS:  Golenberke.

2       MR. TRABOLD:  Your Honor, it's G-o-l-e-n-b-e-r-k-e,

3  I believe.

4       THE COURT:  Who is he?

5       MR. TRABOLD:  He's a BNI agent.

6       THE COURT:  All right.  Go ahead.

7  BY MR. PATTON:

8  Q.   So, prior to October 20, 2004, you had had specific

9  conversations with Agent Golenberke regarding Jeff Roydes?

10  A.   On that day, yes.

11  Q.   So prior to October 20th, you had not had those

12  conversations?

13  A.   Yes, we had conversations about him, but he was actually

14  there that day.

15  Q.   We're going to have to clarify when you say he and they.

16  Prior to October 20, 2004, had you had specific conversations

17  with Agent Golenberke regarding Jeff Roydes, and Jeff Roydes'

18  activities as a confidential informant?

19  A.   Yes.

20  Q.   What were those conversations, when did they take place?

21  A.   Just from information that had been received by the

22  Attorney General's Office and by Golenberke.

23  Q.   What information?

24  A.   As his testimony in prior cases.

25  Q.   You had talked with Golenberke about that prior to


13


1  October 20th?

2  A.   It was common knowledge.

3       THE COURT:  Let me see if I can help here.  Prior to

4  October 20th, tell me as specifically as you can what Agent

5  Golenberke told you about the nature of Mr. Roydes'

6  cooperation; do you understand my question?

7       THE WITNESS:  Information from Golenberke was that

8   we had meetings and we discussed who had -- who had information

9   and who doesn't, it's a common thing for us.  So Mr. Roydes'

10   name had been brought up in other conversations.

11   BY MR. PATTON:

12   Q.   When his name came up in other conversations, what, as

13   specifically as you can recall, what was said about Mr. Roydes?

14   A.   Just about his testimony in other cases.

15   Q.   When you say other cases, in the plural, is that correct?

16   A.   Yes.

17   Q.   So even before October 20, 2004, it was your

18   understanding that Mr. Roydes had testified for the

19   Commonwealth in more than one case?

20   A.   Yes.

21   Q.   And we're talking about actual testimony at trial?

22   A.   Yes, I believe so.  I can't answer that perfectly, I know

23   of at least one and probably two.

24   Q.   Which trials?

25   A.   For the Coulter trial and for, I believe, Perry.


14


1   Q.   What were you told about the specific nature of Mr.

2   Roydes' testimony in those trials?

3   A.   I wasn't.

4   Q.   Is it fair to say, then, that you simply knew that Roydes

5   had testified in these trials?

6   A.   Yes, it is.

7   Q.   But did not have any knowledge regarding the substance of

8   that testimony?

9   A.   Yes, that's true.

10   Q.   Explain to us how you came to sit down and talk with Mr.

11   Roydes on the date of October 20, 2004?

12   A.   He came to the police department.

13   Q.   Roydes came to the police department?

14   A.   Yes, he did.

15   Q.   How did you end up speaking with him there?

16   A.   I was one of the officers on duty and also because I'm a

17   member of the task force.

18   Q.   When you first sat down with Roydes, was there anyone

19   present besides yourself and Mr. Roydes?

20   A.   Yes, Officer Tim Russell.

21        MR. PATTON:  Your Honor, Roydes is spelled

22   R-o-y-d-e-s.

23        THE COURT:  Is that how it appears in the affidavit,

file:///A|/WOODSUPP.TXT

24  R-o-y-d-e-s?

25      MR. PATTON:  Yes.


15


1  BY MR. PATTON:

2  Q.    When you sat down with Mr. Roydes -- I'm sorry, can you

3  give us, was that Officer Tim Russell, was that the other

4  officer's name?

5  A.    Yes, it was.

6  Q.    When you and Mr. Russell sat down with Mr. Roydes at the

7  Titusville police station on October 20, 2004, what did he talk

8  to you about?

9  A.    He talked about the manufacturing of methamphetamine at

10  Lynda Woods' house?

11  Q.    In that conversation with Mr. Roydes, did he give you

12  specifics on how to manufacture methamphetamine?

13  A.    Yes, he did.

14  Q.    After you spoke with Mr. Roydes, what did you do?

15  A.    Actually, after the first interview, after we left the

16  interview room -- Agent Robert Golenberke had came to the

17  police department.

18        THE COURT:  Would you please state that again?

19  Let me ask you again, I'm not trying to be difficult, but hear

20  the level I'm speaking at -- can you do the same thing?

21        THE WITNESS:  Sure can.

22        THE COURT:  All right, do it.

23        THE WITNESS:  After we had interviewed Mr. Roydes,

24  we left the interview room and we met with Robert Goldblum

25  (sic) in our station.


                              16


1  BY MR. PATTON:

2  Q.    You said Goldblum, are you talking about --

3  A.    I'm sorry, Golenberke, I'm sorry, I pronounced it wrong.

4  Q.    Did you talk with Agent Golenberke about your interview

5  of Mr. Roydes?

6  A.    Yes.

7  Q.    Did Golenberke tell you that Roydes was a credible

8  confidential informant?

9  A.    Yes, he did.

10  Q.    What did he tell you specifically with regard to Roydes

11  and Roydes' credibility as a confidential informant?

12  A.    From his testimony and cooperation in other drug cases.

13  Q.    Did he specifically tell you or refer to a particular

14  case that Mr. Roydes had cooperated on?

15  A.    Yes, Roger Coulter.

16  Q.    And, in fact, did Mr. Golenberke tell you that Mr. Roydes

17  was a credible confidential informant because of Roydes past

18  testimony against Roger Coulter?

19  A.    Yes, he did.

20  Q.    Now, at that time, did Agent Golenberke give you any

21  details of the actual cooperation Mr. Roydes provided in the

22  Roger Coulter case?

23  A.    Other than that he was a good CI and a good informant.

24  Q.    Did Agent Golenberke give you any details as to what

25  facts led Agent Golenberke to believe Roydes was a good and


17


1  credible CI?

2  A.    Just briefly.

3  Q.    Well, what did he say?

4  A.    His testimony and his other buys that he had made.

5  Golenberke had worked with him.

6  Q.    Through his testimony and controlled buys that Roydes had

7  made for Golenberke?

8  A.    Yes, or someone from the Attorney General's Office.

9  Q.    At any time from that point on, did you ever get any

10  details regarding the exact nature of Roydes' testimony at any

11  trial he may have testified at?

12  A.    No.

13  Q.    Is it fair to say you relied on Agent Golenberke's

14  assessment of Roydes' credibility?

15  A.    Yes, I did.

16  Q.    And you didn't do any further investigation on your own

17  into whether or not Agent Golenberke's opinion was right or

18  wrong?

19  A.    No, I didn't.

20  Q.    You relied entirely on Agent Golenberke's assessment of

21  Roydes' credibility?

22  A.    Yes.

23  Q.    When you were speaking with Mr. Roydes, did he ever

24  mention the fact that he had either that day or the day before

25  had harassment charges filed against him by his girlfriend,

1  Holly Kennear?

2  A.   No, he did not.

3  Q.   Did you have any knowledge independent of what Roydes --

4  well, let me ask you this.  Did you have any knowledge that

5  charges had been filed against Roydes?

6  A.   No, I did not.

7  Q.   Did you make any effort to run a criminal history check

8  on Mr. Roydes?

9  A.   No, I did not.

10  Q.   Is it fair to say that after you spoke with Roydes and

11  then after you spoke with Agent Golenberke, that you then wrote

12  your affidavit in support of a search warrant?

13  A.   Yes.

14  Q.   You didn't do any further investigation before you

15  started writing the application for a search warrant, correct?

16  A.   There were other interviews done, but with Mr. Roydes.

17  Q.   Mr. Roydes was interviewed a second time?

18  A.   A second and a third time.

19  Q.   After he was talked to the second and the third time, did

20  you then do an affidavit in support of your search warrant?

21  A.   Yes.

22  Q.   Is it fair to say that it was immediately after the third

23  conversation with Roydes that you sat down and started typing

24  your affidavit?

25  A.   Within two or three hours, yes.


19


1  Q.   In those two or three hours, did you do any -- take any

2  steps to try and confirm any of the information Roydes gave

3  you?

4  A.   No.

5  Q.   When Roydes was spoken to for the second time, were you

6  present?

7  A.   Yes, I was.

8  Q.   Who else was present?

9  A.   Golenberke and Russell.

10  Q.   Did Roydes tell you anything in the second interview that

11  he had not told you in the first interview?

12  A.   Not that I recall.

13  Q.   In the third interview were you present?

14  A.   Yes.

15  Q.   Who else was present?

16  A.   Myself and Russell.  Russell was there for not the whole

17  interview, just part of it.

18  Q.   Golenberke was not there?

19  A.   No, he was not.

20  Q.   In the third interview, did Roydes tell you anything

21  different than what he had told you in the first or second

22  interview?

23  A.   No, he just put in writing what he had told us in the

24  interviews.

25  Q.   So in that third interview Roydes made a written

20

1  statement?

2  A.   Yes.

3  Q.   So then it was within two or three hours after the end of

4  the third interview that you wrote your affidavit in support of

5  a search warrant?

6  A.   Yes.

7       MR. PATTON:  May I have a moment, your Honor?

8       THE COURT:  Yes.

9          MR. PATTON:  Your Honor, those are my questions.

10          THE COURT:  All right.  Mr. Trabold.

11                    CROSS-EXAMINATION

12   BY MR. TRABOLD:

13   Q.    Officer Peterson, prior to you executing the search

14   warrant on Lynda Woods' house, you sought and received approval

15   from the Venango County DA's Office, correct?

16   A.    Yes, we did.

17   Q.    That would be District Attorney Marie Veon's office?

18   A.    Yes.

19   Q.    In fact, not only did you submit the search warrant to

20   the District Attorney's Office in Venango County, the search

21   warrant went back and forth several times, correct?

22   A.    Yes, it did.

23   Q.    And that was by process of fax?

24   A.    Yes, it was.

25   Q.    And changes were made to the search warrant by the


                              21


1   District Attorney's Office and then returned to the Titusville

2   Police Department, and that occurred several times?

3   A.   Yes, it did.

4   Q.   And is that relatively standard course for the Titusville

5   Police Department?

6   A.   If you're doing something out of Venago County, yes.

7   Q.   I think you said you're on the drug task force down

8   there?

9   A.   Yes.

10  Q.   And that would be primarily a methamphetamine focus drug

11  task force?

12  A.   Yes, it would be.

13  Q.   Is that a standard operating procedure in task force

14  cases, to attempt to obtain approval from the DA's Office where

15  you're operating out of?

16  A.   Yes, it would be.

17  Q.   Now, after you obtained approval from the Venango County

18  DA's Office, you then executed the search warrant?

19  A.   Yes.

20  Q.   And it so happens that Mr. Roydes was correct?

21  A.   Yes, he was.

22  Q.   Now, you didn't have a whole lot of personal contact with

23  Jeff Roydes prior to him coming to the Titusville Police

24  Department on, I believe it was October 19th?

25  A.   Yes, he came on October 20th, but I had not had a lot of


22


1   prior contact with him.

2   Q.   Do you recall the nature of your contacts with him

3   previous to the 20th of October of 2004?

4   A.   Not fully, no.

5   Q.   But it would just be along the lines of Mr. Roydes was

6   involved in the methamphetamine community that the Titusville

7   Police Department was investigating?

8   A.   That's correct.

9   Q.   So you didn't conduct, prior to October 20, 2004, any

10  investigations of Jeff Roydes?

11  A.   No, I did not.

12  Q.   You just knew that Mr. Roydes was involved in the

13  methamphetamine group of people in your area?

14  A.   Yes, that's correct.

15  Q.   And you mentioned something about you had regular

16  meetings, law enforcement meetings?

17  A.   Correct.

18  Q.   Am I correct in saying that those are along the lines of

19   intelligence meetings where various law enforcement officers

20   from around the area gather and discuss the information they

21   have about methamphetamine?

22   A.   Yes.

23   Q.   And as part of those discussions, you discussed the

24   information you had about people that are manufacturing

25   methamphetamine and those people on the periphery of the

23

1   manufacturing?

2   A.   Yes, that's correct.

3   Q.   And various people come up during the course of the

4   meetings, correct?

5   A.   Yes, they do.

6   Q.   And officers have what can be characterized as informal

7   discussions about people that they're covering in a given

8   meeting?

9   A.   Yes.

10   Q.   And what I mean by that is nobody pulls out prior

11   testimony in cases and goes over it line by line, correct?

12   A.   No, they do not.

13  Q.    An officer may make an offhand remark about, hey, I know

14  this guy testified for me in the past or this guy was providing

15  me some information that was reliable in the past?

16  A.    Yes.

17  Q.    And that's what happened with regard to Mr. Roydes?

18  A.    Yes, it was.

19  Q.    And with regard to Mr. Roydes, Agent Golenberke told you

20  on October 20th that Mr. Roydes -- your recollection is that

21  Mr. Roydes had cooperated or provided information in the Roger

22  Coulter case?

23  A.    Yes.

24  Q.    And do you recall Agent Golenberke also telling you

25  something about Fred Perry?


24


1  A.    Yes.

2  Q.    Okay.  So not only did he tell you about, it's your

3  recollection he told you about Mr. Roydes providing information

4  about Roger Coulter, your recollection is that Agent Golenberke

5  told you that Mr. Roydes cooperated against Fred Perry?

6  A.    Yes.

7   Q.    And is it fair to say, just so we can give some

8   background information to the judge, the Roger Coulter case was

9   a lengthy investigation that occurred down in your area?

10  A.    Yes, it was.

11  Q.    And it ended up in the conviction of Mr. Coulter and a

12  whole host of other people who were involved in a wide-ranging

13  methamphetamine manufacturing?

14  A.    Yes, it was.

15  Q.    It was multiple people that were convicted, along with

16  Mr. Coulter himself?

17  A.    Yes.

18  Q.    And is it fair to say the investigation lasted over a

19  lengthy period of time?

20  A.    Yes, it did.

21  Q.    Involving a number of informants and a number of people

22  from across the region providing information?

23  A.    Yes.

24  Q.    Now, I think you testified that you had no idea when you

25  wrote this search warrant affidavit that is the subject of this

25

1  case that Mr. Roydes had been charged with harassment the day

2  before?

3  A.   No, I did not.

4  Q.   In fact, you took the step when Mr. Roydes came into the

5  Titusville Police Department, to ask him why he was providing

6  information about Lynda Woods, did you not?

7  A.   Yes, I did.

8  Q.   And Mr. Roydes told you that the reason he was providing

9  the information is because he did not like what was happening

10  to Mrs. Woods' daughter, correct?

11  A.   That's correct.

12  Q.   What I mean by that is Mr. Roydes told you that Lynda

13  Woods had a young daughter in the house while she was

14  manufacturing methamphetamine and Mr. Roydes did not want to

15  see that situation continue?

16  A.   That's correct.

17  Q.   Now, counsel asked you did you check Mr. Roydes' criminal

18  history, and you did not do so?

19  A.   No, I did not.

20  Q.   But in your experience as a police officer, is it highly

21  unlikely that Mr. Roydes' harassment complaint filed the day

22  before would have even appeared on his criminal history,

23  correct?

24  A.   No, it would not have.

25  Q.   In fact, in your experience as a police officer, that

26

1  would almost never happen that somebody's criminal or a

2  harassment complaint or citation would be input into the NCIC

3  system that quick?

4  A.   No, it would not.

5  Q.   So even if you had checked his criminal history, the

6  chances that that prior citation the day before would have been

7  on a NCIC would have been almost nil?

8  A.   That's true.

9  Q.   And it would not have been listed in any way, shape or

10  form who the person providing the complaint to the police was?

11  A.   No, it would not.

12  Q.   If you ran his NCIC criminal history, all it would say

13  was -- if it was even in there, which you said would be

14  unlikely, would be the nature of the case?

15  A.   That's correct.

16   Q.    And in your experience with regard to harassment charges,

17   that's a summary offense in Pennsylvania?

18   A.    That's correct.

19   Q.    Typically, on summary offenses, I take it you know this

20   from your own experience, on summary offenses the officer

21   doesn't -- a citation is just mailed to somebody?

22   A.    Yes, that's a good chance that would happen.

23   Q.    And what I mean by that is it's not likely that Mr.

24   Roydes was arrested by the Pennsylvania State Police, taken in

25   front of a magistrate and then given a criminal complaint

27

1   listing harassment?

2   A.    No.

3   Q.    In fact, that's highly unlikely?

4   A.    Yes, it is.

5   Q.    Now, you testified that you interviewed Mr. Roydes on

6   several occasions that night, I think three times?

7   A.    Yes.

8   Q.    And your purpose in doing so was to make sure that Mr.

9   Roydes was providing consistent information?

10  A.    That's correct.

11  Q.    Your purpose in doing so was essentially to test his

12  credibility?

13  A.    Yes.

14  Q.    And is it fair to say that your testing of his

15  credibility over the course of those three interviews led you

16  to the conclusion that Mr. Roydes was being credible?

17  A.    Yes.

18  Q.    Prior to Mr. Roydes coming in to talk to you on October

19  20th, did you have information or a basis of knowledge that

20  Lynda Woods may have been producing methamphetamine?

21  A.    Yes, I did.

22  Q.    So there was law enforcement intelligence information

23  that prior to Mr. Roydes coming in and telling you about it,

24  that Mrs. Woods was manufacturing meth?

25  A.    Yes.


28


1  Q.    And, in fact, did you know that Mrs. Woods -- the state

2  police had a case pending against Mrs. Woods dating back to

3  August of 2004?

4   A.   Yes, I did.

5   Q.   So this isn't a situation where Mr. Roydes came in,

6   talked you about Lynda Woods and you were completely shocked

7   that Mrs. Woods was involved in methamphetamine?

8   A.   No.

9   Q.   And, in fact, you were aware that Mrs. Woods husband,

10  Michael Woods, had previously been convicted on federal

11  methamphetamine charges?

12  A.   Yes, I am.

13       THE COURT:  Let me ask a quick question here.  Why

14  didn't you put that in the affidavit?

15       THE WITNESS:  On the prior investigation?

16       THE COURT:  The fact that you were aware that drug

17  contraband had been found at the residence earlier on in

18  connection with Mrs. Woods other charge?

19       THE WITNESS:  The information in the search warrant,

20  as we sent it down to Venango County District Attorney's

21  Office, they wanted us to word it the way we had worded it.

22       THE COURT:  All right, go ahead.

23  BY MR. TRABOLD:

24  Q.   Is it fair to say that you didn't put all that prior

25  knowledge you had about the Woods, Mrs. Woods or her husband,

29

1    simply because that wasn't information that you were personally

2    working on?

3    A.    Yes, it was not information we received on the 20th.

4    Q.    That wouldn't have been information that you had a whole

5    lot of personal knowledge about?

6    A.    Yes, that's correct.

7    Q.    And your goal in this case was simply to draft this

8    search warrant, get approved by the Venango County DA's Office

9    and execute it based on what Jeff Roydes was telling you that

10   night?

11   A.    Yes.

12   Q.    Had Mr. Roydes provided you a pretty large amount of

13   detail with regard to the manufacturing of meth, the process by

14   which that is done?

15   A.    Yes, he did.

16   Q.    And you knew that what Mr. Roydes told you about that

17   process was accurate based on your experience?

18   A.    Yes.

19   Q.    And Mr. Roydes provided to you his personal observations

20  from inside the Woods' residence, correct?

21  A.    Yes.

22  Q.    This isn't a situation where Mr. Roydes came and said

23  I've heard from Joe Blow that Lynda Woods is manufacturing

24  meth?

25  A.    No, he stated that he seen it.


                              30


1  Q.    He stated that he had seen this activity in the days just

2  prior to him coming and talking to you?

3  A.    Yes.

4  Q.    Did the Fred Perry case and/or the Roger Coulter cases,

5  were these Titusville PD cases?

6  A.    They were Attorney General cases.

7  Q.    Cases that Agent Golenberke would have been involved in

8  himself?

9  A.    Yes.

10  Q.    Did you have any personal involvement in either one of

11  those cases?

12  A.    No, I did not.

13  Q.    Those cases would have occurred several years prior to

14    the case we're here on today?

15    A.    Yes.

16    Q.    In fact, the Coulter case was mid '90s, correct?

17    A.    Correct.

18          MR. TRABOLD:  One moment, your Honor.

19          THE COURT:  All right.

20          MR. TRABOLD:  Nothing further.

21          THE COURT:  Okay, anything else, Mr. Patton?

22          MR. PATTON:  Yes, your Honor.

23                REDIRECT EXAMINATION

24    BY MR. PATTON:

25    Q.    You testified about your search warrant application being


                              31


1    faxed back and forth between yourself and the Venango County

2    District Attorney's Office, is that correct?

3    A.    Yes.

4    Q.    At any point in time did your affidavit contain any

5    additional information about Roydes that did not end up in the

6    final warrant?

7    A.    I do not recall of any.

8    Q.    Now, you talked some with Mr. Trabold about your

9    intelligence meetings that the drug task force has?

10   A.    Yes.

11   Q.    And I believe you testified that Roydes' name came up in

12   those intelligence meetings, is that correct?

13   A.    Yes.

14   Q.    His name came up as someone who was involved with the

15   methamphetamine activity in the Titusville area?

16   A.    Yes.

17   Q.    So his name would have come up in relation with people

18   that were manufacturing methamphetamine?

19   A.    Yes.

20   Q.    And that he was involved in that type of activity?

21   A.    Yes.

22   Q.    And this was all information that you had prior to

23   October 20, 2004?

24   A.    Yes.

25   Q.    Now, I believe in your direct testimony you had testified

32

1    that Golenberke told you that Roydes was credible because of

2   his testimony against Roger Coulter, is that correct?

3   A.   Yes.

4   Q.   But, then, I believe in your cross-examination you

5   testified that Golenberke mentioned in addition to Roger

6   Coulter, the name Fred Perry?

7   A.   Yes.

8   Q.   Well, Officer Peterson, as part of your responsibilities

9   and duties as a police officer, you write reports to

10   memorialize your investigations, is that correct?

11   A.   Yes.

12   Q.   And you received, part of your training in becoming a

13   police officer involved writing what I will refer to as police

14   reports, is that correct?

15   A.   Yes.

16   Q.   So you have been trained on how to write reports?

17   A.   Yes.

18   Q.   And in that training was it stressed to you that it is

19   important that your reports be accurate?

20   A.   Yes.

21   Q.   And complete?

22   A.   Yes.

23  Q.   So that they are an accurate and complete documentation

24  of what you did?

25  A.   Yes.


33


1   Q.   Did you write a report regarding this investigation that

2   you've been testifying about today?

3   A.   Yes, I have.

4        MR. PATTON:  May I approach, your Honor.

5        THE COURT:  Yes.

6        MR. PATTON:  Your Honor, I have marked this as

7   Defendant's Exhibit K.

8        THE COURT:  Is it part of the record?

9        MR. PATTON:  It is not.

10  BY MR. PATTON:

11  Q.   Officer Peterson, can you look at Defendant's Exhibit K?

12  A.   Okay.

13  Q.   Is that the report you wrote regarding this incident?

14  A.   Yes, it is.

15  Q.   Could you look on page five of that report and starting

16  with the paragraph "at this point", could you read that; you

17  need to read slowly so the court reporter can take it down?

18  A.    "At this point Agent Golenberke of the Attorney General's

19  Office had stopped in our station, Russell and I both on the

20  Attorney General's drug task force, interviewed the informant

21  with Golenberke, interviewed Roydes and told us that Roydes was

22  a credible CI.  Because of his past testimony against Roger

23  Coulter and go ahead and start getting a search warrant ready."

24  Q.    You can stop there.  Could you review the remaining

25  portions of your report and point out to me where Agent


34


1  Golenberke mentioned Fred Perry to you?

2  A.    Fred Perry's name is not in the report.

3  Q.    Roger Coulter's name is in the report, correct?

4  A.    Yes.

5  Q.    Fred Perry's name is not?

6  A.    That's correct.

7  Q.    And your report says that Golenberke told you that Roydes

8  was a credible CI because Roydes had testified against Roger

9  Coulter, correct?

10  A.    Yes.

11   Q.   Golenberke never mentioned Fred Perry to you, correct?

12   A.   Yes, he did.

13   Q.   So Golenberke told you, mentioned the name Fred Perry,

14   you just forgot to put that in your report?

15   A.   Yes, I did forget to put that in the report.

16   Q.   Well, how did that happen?

17   A.   I don't know.

18   Q.   Well, did you talk with Agent Golenberke at all about

19   Roydes' testimony against Fred Perry?

20   A.   Could you repeat that, please.

21   Q.   Did you discuss with Agent Golenberke the substance of

22   Roydes' testimony against Fred Perry?

23   A.   In detail, no.

24   Q.   Did you talk with him at all about it, other than him

25   mentioning that Roydes had testified?


35


1   A.   No.

2   Q.   And so I want to make sure I have this correct.

3   Golenberke told you that Roydes testified against Roger Coulter

4   and also testified against Fred Perry?

5   A.   Yes.

6   Q.   But you guys did not get into any details at all

7   regarding Roydes actual testimony?

8   A.   No.

9   Q.   You were asked some questions about your knowledge of

10  Mrs. Woods being involved with methamphetamine, do you recall

11  that?

12  A.   Yes, I do.

13  Q.   Was the fact that Michael Woods, Lynda's husband, had

14  been convicted and sentenced in federal court for a

15  methamphetamine related offense, was that kind of common

16  knowledge in the Titusville area?

17  A.   Yes, it was.

18  Q.   And in October of 2004, had Mrs. Woods had state charges

19  filed against her relating to her involvement with

20  methamphetamine?

21  A.   You said prior to?

22  Q.   In October -- I'll put it this way.  Prior to October 20,

23  2004, Mrs. Woods had state charges pending against her for a

24  methamphetamine related offense?

25  A.   I believe it was state charges.

1   Q.    There were some criminal charges?

2   A.    Yes.

3   Q.    And that was common knowledge in the Titusville area?

4   A.    Yes, it was.

5   Q.    Now, I believe you testified that you had no personal

6   involvement in either the Fred Perry or Roger Coulter case, is

7   that correct?

8   A.    No, I did not.

9   Q.    I guess you also testified that you had no personal

10  knowledge of the details of the prior investigations of Mrs.

11  Woods?

12  A.    No, I did not.

13  Q.    And that was part of the reason why you didn't put that

14  information in the affidavit?

15  A.    That's correct.

16  Q.    And so you didn't want to put that stuff in the affidavit

17  because you had no personal knowledge of it?

18  A.    That's correct.

19  Q.    But you didn't have any personal knowledge of Roydes'

20  cooperation against Perry or Coulter, is that correct?

21  A.   That's correct.

22  Q.   But you used that information in your affidavit to

23  support your allegations that Roydes was a credible CI?

24  A.   Yes.

25       MR. PATTON:  Those are my questions, your Honor.


                              37


1              RECROSS-EXAMINATION

2  BY MR. TRABOLD:

3  Q.   Sir, you didn't have personal knowledge of Roydes'

4  cooperation in the two cases that you talked about but Agent

5  Golenberke did, he was there with you?

6  A.   Yes, he was.

7  Q.   You didn't have anybody from PSP or the local agency

8  there with you on October 20th to talk about Mrs. Woods prior

9  involvement with meth in August of 2004?

10  A.   No, I did not.

11  Q.   So you included the information about Mr. Roydes prior

12  cooperation in the affidavit because the person that had

13  personal knowledge about it was there with you?

14  A.   That's correct.

15  Q.    And you didn't include the prior information about Mrs.

16  Woods' involvement with methamphetamine because you had no law

17  enforcement officer there with you to share their personal

18  observations?

19  A.    That's correct.

20  Q.    Just so the record is clear, you had no, at the time this

21  search warrant was drafted and executed, you had no information

22  whatsoever to indicate that Mr. Roydes had any personal ax to

23  grind with Mrs. Woods?

24  A.    No, I did not.

25        MR. TRABOLD:  Nothing further, your Honor.


                              38


1        THE COURT:  Anything else?

2        MR. PATTON:  No, sir.

3        THE COURT:  All right, thank you, sir, you're

4  excused.

5        MR. PATTON:  We would call Jeff Roydes.

6        THE COURT:  Mr. Roydes come over here to my court

7  reporter, give him your name and spell it for me, please?

8        THE WITNESS:  Jeffrey Roydes, R-o-y-d-e-s.

9      THE COURT:  Raise your right hand.

10          JEFFREY ROYDES, DEFENSE WITNESS, SWORN

11                DIRECT EXAMINATION

12  BY MR. PATTON:

13  Q.    Could you tell us your name, please?

14  A.    Jeffrey Roydes.

15  Q.    Could you spell your last name, please?

16  A.    R-o-y-d-e-s.

17  Q.    Mr. Roydes, I'm going to ask you to keep your voice up

18  and speak into the microphone so that everyone can hear you,

19  all right?

20  A.    Yes.

21  Q.    Mr. Roydes, did you provide information to an Officer

22  Clarence Peterson of the Titusville Police Department with

23  regard to Lynda Woods involvement in the manufacture of

24  methamphetamine?

25  A.    Yes.


                                39


1  Q.    Are you the individual who was referred to as the CI in

2  the affidavit in support of the search warrant for Mrs. Woods'

3  home?

4  A.   Yes.

5  Q.   Prior to speaking with Officer Peterson on October 20,

6  2004, had you ever cooperated with law enforcement?

7  A.   Yes, I have.

8  Q.   On how many occasions?

9  A.   One other occasion.

10  Q.   What was that one other occasion?

11  A.   Fred Perry's trial.

12  Q.   How did you become involved with Mr. Perry's trial?

13  A.   I guess I was a co-defendant.

14  Q.   You were a co-defendant of Mr. Perry?

15  A.   Yes.

16  Q.   Did you go to trial?

17  A.   No, I did not.

18  Q.   Did you plead guilty to some of the charges that had been

19  filed against you?

20  A.   Yes.

21  Q.   Do you recall what those were that you pled guilty to?

22  A.   Delivery of a controlled substance.

23  Q.   By the time of Fred Perry's trial, had you pled guilty to

24  those charges?

25  A.   Yes.


                                40


1  Q.   Had you been sentenced on those charges?

2  A.   Yes.

3  Q.   How did you end up then testifying at Mr. Perry's trial?

4  A.   Agent Golembeski --

5       THE COURT:  Keep your voice up.

6       THE WITNESS:  Agent Golembeski from the Attorney

7  General's Office had come to me and talked to me.

8  BY MR. PATTON:

9  Q.   Did they request your testimony against Mr. Parks?

10  A.   Yes.

11  Q.   Did you agree to testify?

12  A.   Yes.

13  Q.   Did you actually testify at Mr. Parks' trial?

14  A.   Yes, I did.

15       MR. TRABOLD:  Just so the record is clear, do you

16  mean Perry?

17       MR. PATTON:  Perry, I'm sorry.

18  BY MR. PATTON:

19  Q.    Did you testify at Mr. Perry's trial?

20  A.    Yes.

21        MR. PATTON:  May I approach, your Honor?

22        THE COURT:  Yes.

23  BY MR. PATTON:

24  Q.    I'm going to show you Defendant's Exhibit I, which is

25  part of the record, and ask you just briefly kind of take a


41


1  look at that; is Defendant's Exhibit I a transcript of the

2  testimony you provided at Mr. Perry's trial?

3  A.    Yes.

4  Q.    Did you have a chance to review that before you were

5  called to testify?

6  A.    Yes.

7  Q.    Did your testimony at Mr. Perry's trial involve you

8  talking about controlled buys that were made from you by state

9  police troopers?

10  A.    Yes.

11  Q.    How many controlled buys were made from you?

12   A.   Two.

13   Q.   Were those controlled buys actually the offenses you had

14   pled guilty to?

15   A.   Yes.

16   Q.   During your testimony at the Perry trial, did you explain

17   to the jury how those controlled buys were conducted?

18   A.   Yes, I did.

19   Q.   Did you ever testify at the trial of Roger Coulter?

20   A.   No.

21   Q.   Did you testify at any trial other than Mr. Perry's

22   trial?

23   A.   No.

24   Q.   Other than today and at Mr. Perry's trial, have you ever

25   testified in any proceeding?


42


1   A.   No.

2   Q.   So the only times you have testified in court are today

3   and Mr. Perry's trial, is that correct?

4   A.   Yes.

5   Q.   Have you ever made controlled buys for law enforcement?

6   A.   No.

7   Q.   Have you ever worked with an Attorney General agent by

8   the name of Rob Golenberke as a confidential informant?

9   A.   No.

10  Q.   Was Agent Golenberke present on October 20th when you

11  were in the Titusville Police Department?

12  A.   Yes, he was.

13  Q.   Prior to October 20th had you ever worked with Agent

14  Golenberke?

15  A.   No, I hadn't.

16  Q.   Was he the BNI agent that you had worked with in the

17  Perry trial?

18  A.   No, that was Golembeski.

19  Q.   Those are two different BNI agents, correct?

20  A.   Yes.

21  Q.   Other than the information that you gave to the

22  Titusville Police on October 20th and your testimony in the

23  Perry trial, had you ever worked as a source of information for

24  law enforcement?

25  A.   No.

43

1  Q.   Other than the search warrant at issue in this case, have

2  you ever been used as a confidential informant to provide

3  information that was put in an affidavit that was used to

4  obtain a search warrant?

5  A.   No.

6  Q.   Do you recall what county the Fred Perry trial occurred

7  in?

8  A.   Crawford.

9  Q.   It was not in Venango County?

10  A.   No.

11        THE COURT:  Let me ask a question about this

12  testimony, I haven't had an opportunity to read it yet, I know

13  it's part of the record.  But you said you testified about

14  controlled buys that you made from state policemen, is that

15  right?

16        MR. PATTON:  That the state policemen made from him.

17        THE COURT:  That the state policemen made from you?

18        THE WITNESS:  Yes.

19        THE COURT:  These are uncover agents, I assume?

20        THE WITNESS:  Yes.

21        THE COURT:  All right, go ahead.

22  BY MR. PATTON:

23  Q.   Now, in the first controlled buy that was made from the

24  undercover state troopers from you, did that involve actual

25  methamphetamine?

44

1  A.   Yes, it did.

2  Q.   About how much?

3  A.   1.2 grams, something like that.

4  Q.   Who did you obtain from methamphetamine from?

5  A.   Fred Perry.

6  Q.   Had the agents driven you up to Mr. Perry's house?

7  A.   Yes, they did.

8  Q.   Did you receive the methamphetamine from Mr. Perry while

9  you were up at the house?

10  A.   No.

11  Q.   Did you make arrangements after you were at Perry's house

12  to meet Perry later to obtain the methamphetamine?

13  A.   Yes.

14  Q.   Did the state troopers see you meeting later with Perry?

15  A.   Yes.

16  Q.   After you then met with Perry, did you come back and give

17  the methamphetamine to the troopers?

18  A.   Yes.

19  Q.   Did you give the troopers all of the methamphetamine that

20  you had gotten from Perry?

21  A.   No.

22  Q.   Why not?

23  A.   Because I kept some for myself.

24  Q.   Did you tell the trooper that you had done that?

25  A.   No.


45


1  Q.   But did you testify to that at the Perry trial?

2       THE COURT:  Testify to what?

3  BY MR. PATTON:

4  Q.   About him taking some of the meth out of that first

5  controlled purchase?

6  A.   I believe so.

7  Q.   Do you recall whether you did or not?

8  A.   No.

9  Q.   If you reviewed the transcript, would that refresh your

10  recollection?

11  A.    Probably.

12         THE COURT:  We're going to take a short break.

13         (Recess from 10:40; until 10:48 a.m.)

14  BY MR. PATTON:

15  Q.    Mr. Roydes, if you look at page 187 of Defendant's

16  Exhibit I, just read that page to yourself?

17         THE COURT:  Let him know when you completed it, sir.

18         THE WITNESS:  Okay.

19  BY MR. PATTON:

20  Q.    Having read that, does that refresh your recollection as

21  to whether or not you testified at the Perry trial regarding

22  your removal of part of the methamphetamine for yourself before

23  you gave it to the state troopers?

24  A.    Yes.

25  Q.    Stay close to the mike, keep your voice up, okay?


46


1  A.    Yes.

2         THE COURT:  Did the officers think they were going

3  to get 1.2 grams, is that what the deal was supposed to be?

4          MR. PATTON:  Actually, it was supposed to be four

5    grams, $400 for four grams.

6          THE COURT:  Is that what -- I'm trying to understand

7    what's going on here.  Did you testify that you were supposed

8    to give them four grams but you kept some of it for yourself?

9          THE WITNESS:  Yes.

10          THE COURT:  All right, go ahead.

11    BY MR. PATTON:

12    Q.    Now, you didn't tell the officers that on the evening of

13    the controlled buy, correct?

14    A.    No.

15    Q.    No, you did not tell the officers that?

16    A.    No, I did not.

17          THE COURT:  Keep your voice up, please.

18    BY MR. PATTON:

19    Q.    But you did testify to it at the trial?

20    A.    Yes.

21    Q.    The second controlled purchase that was made from you,

22    what did the officers think they were getting?

23    A.    Methamphetamines.

24    Q.    What did you give them?

25  A.    Crushed up pills.


47


1   Q.    Crushed up methamphetamine pills?

2   A.    No, they were NoDoz.

3   Q.    So you did not give them methamphetamine?

4   A.    No.

5         THE COURT:  Did that form the subject matter of part

6   of your testimony in the Perry trial?

7         THE WITNESS:  Yes.

8   BY MR. PATTON:

9   Q.    Even though it was not actually methamphetamine, were you

10  charged and pled guilty to distributing what you had purported

11  to be methamphetamine?

12  A.    Yes.

13  Q.    And you testified about that at the Perry trial?

14  A.    Yes.

15  Q.    Now, at the Perry trial did you mention any contact or

16  did you mention Roger Coulter?

17  A.    No, I did not.

18  Q.    Did you testify about driving to Roger Coulter's

19  residence with Mr. Perry?

20  A.   I don't recall.

21       MR. PATTON:  Can I approach for one second?

22       THE COURT:  Yes.  You don't have to ask permission.

23  BY MR. PATTON:

24  Q.   You have a copy of it there, Mr. Roydes, could you go to

25  page 192 and read that page, please, to yourself -- and page


                                48


1  193 as well.

2  A.   Okay.

3  Q.   Having read that portion of the transcript, does that

4  refresh your recollection as to whether or not you at least

5  mentioned Roger Coulter some in your testimony at the Perry

6  trial?

7  A.   Yes.

8  Q.   Did you mention Roger Coulter?

9  A.   Yes.

10  Q.   What were you asked about him and what did you say?

11  A.   Just if I've ever been to his house.

12  Q.   And did you testify that Mr. Perry -- you believed Mr.

13   Perry was getting his methamphetamine from Roger Coulter?

14   A.   Yes.

15   Q.   And that you had been to Roger Coulter's house with Mr.

16   Perry two or three times?

17   A.   Yes.

18   Q.   But that you would stay in Mr. Perry's car while Mr.

19   Perry went into the home?

20   A.   Yes.

21   Q.   When you were talking with Agent Golembeski regarding

22   testimony at the Perry trial, did you discuss with him other

23   things, other than your relationship with Mr. Perry?

24   A.   No.

25   Q.   Were your discussions focused on testifying against Mr.

49

1   Perry?

2   A.   Yes.

3   Q.   Did you give any general information about other people

4   that you knew who were involved in the methamphetamine

5   business?

6   A.   No.

7   Q.   At the time you were talking with Agent Golembeski, where

8   were you staying?

9   A.   Crawford County Correctional Facility.

10  Q.   Excuse me?

11  A.   I was in jail.

12  Q.   And how long had you been in jail?

13  A.   Year and a half.

14       MR. PATTON:  Those are my questions, your Honor.

15                   CROSS-EXAMINATION

16  BY MR. TRABOLD:

17  Q.   Mr. Roydes, you testified in the Fred Perry case in

18  Crawford County, correct?

19  A.   Yes.

20  Q.   Even during your testimony against Fred Perry, you

21  provided information that you knew about other people involved

22  in the drug trade, correct?

23  A.   I believe so, yes.

24  Q.   So when you testified just now by Attorney Patton that

25  you didn't provide information about other people, that would

                            50

1  not be accurate, correct?

2  A.    Yes.

3  Q.    You provided information about a whole lot of other

4  people other than just Fred Perry?

5  A.    Not a whole lot.

6  Q.    Well, how many would you say?

7  A.    Maybe a couple.

8  Q.    You were you charged in a conspiracy with a person by the

9  name of Rickey Richards, correct?

10  A.    Yes.

11  Q.    You provided information about Mr. Richards, correct?

12  A.    No, I did not.

13  Q.    Well, Mr. Richards pled guilty in the case that you were

14  involved in, correct?

15  A.    Yes.

16  Q.    You didn't provide any information about Mr. Richards?

17  A.    No.

18  Q.    How about Laraine Donovan, did you provide information

19  about her?

20  A.    No.

21  Q.    Do you recall testifying that you saw Laraine Donovan

22  give methamphetamine to police officers?

23  A.  Yes, I did.

24  Q.  So you did provide information about Laraine Donovan?

25  A.  Yes, just that I was there at the time, yes.


51


1  Q.  You also provided information that you saw Fred Perry,

2  and you know that Fred Perry, yourself, and Laraine Donovan all

3  shared methamphetamine, correct?

4  A.  Yes.

5  Q.  So you did provide information about Laraine Donovan?

6  A.  Yes.

7  Q.  Without any question?

8  A.  Yes.

9  Q.  And you also provided information about Roger Coulter,

10  correct?

11  A.  In a way, yes.

12  Q.  Well, not in a way.  You testified in the Fred Perry case

13  that Fred Perry told you that his source of methamphetamine was

14  Roger Coulter, correct?

15  A.  Yes.

16  Q.  So that would be providing information not only about

17  Fred Perry, but Roger Coulter, correct?

18  A.   Yes.

19  Q.   It would be fair to say that the Roger Coulter case

20  involved a whole lot of people?

21  A.   Yes.

22  Q.   In fact, you were in a way involved in the Roger Coulter

23  case, correct?

24  A.   Yes.

25  Q.   And that would have involved over 20 people, correct?


52


1  A.   Yes.

2  Q.   Whether you were actually charged with Roger Coulter

3  himself or separately, correct?

4  A.   Yes.

5  Q.   Essentially, what the Roger Coulter case amounts to,

6  Roger Coulter was way up here, and then there were people all

7  beneath him who were getting their drugs either directly from

8  Roger Coulter or from people that were getting it from Roger

9  Coulter, correct?

10  A.   Yes.

11  Q.   A wide-ranging drug conspiracy, correct?

12  A.   Yes.

13  Q.   And not only did you provide testimony against Fred

14  Perry, you even testified against Laraine Donovan, correct?

15  A.   No, I didn't.

16  Q.   I mean you provided information in your testimony against

17  her?

18  A.   Yes.

19  Q.   And you provided information against Roger Coulter?

20  A.   Yes.

21  Q.   Okay.

22       THE COURT:  Let me ask this, it would be a matter of

23  record, was Perry and Donovan on trial at the same time?

24       MR. TRABOLD:  Let me see if the witness knows.

25  BY MR. TRABOLD:


53


1  Q.   Fred Perry was the only person on trial when you

2  testified in his case, correct?

3  A.   Yes.

4  Q.   That would be because the other people that were charged

5   along with you and Fred Perry, had already pled guilty,

6   correct?

7   A.   Yes.

8   Q.   So Ms. Donovan at the time you offered information about

9   her in the Fred Perry case, had already pled guilty?

10  A.   Yes.

11  Q.   So it's not accurate when counsel says you only provided

12  information about Fred Perry, correct?

13  A.   Yes.

14  Q.   Now, when you got to the Titusville Police Department on

15  October 20th of 2004, did you know that you been charged the

16  previous day with harassment?

17  A.   Yes, I did.

18  Q.   You didn't provide that information though to the

19  Titusville police officer that questioned you?

20  A.   No.

21  Q.   And you told the Titusville police officer that

22  questioned you that your reason for being there was because you

23  didn't like, let me paraphrase, something to the effect of you

24  didn't like what Mrs. Woods was doing to her children,

25  something to that effect?

54

1  A.   Yes.

2  Q.   And you provided that information to Officer Peterson

3  about what you knew Lynda Woods was doing in her house?

4  A.   Yes.

5  Q.   That was information that you knew about from things that

6  had happened just days previous?

7  A.   Yes.

8  Q.   And it was information that you knew about, not

9  secondhand, but from your own first-hand observations?

10  A.   Yes.

11  Q.   Now, you testified that you made some controlled buys or

12  not made controlled buys, but you sold, got drugs from Fred

13  Perry, then passed those drugs on to law enforcement officers,

14  correct?

15  A.   Yes.

16  Q.   At the time you did that, did you know that the people

17  you were then passing Fred Perry's drugs on to were law

18  enforcement officers; I mean, was that set up between you and

19  them or did you think that the people you were passing on Fred

20  Perry's drugs to were other meth heads?

21  A.    I thought they were other users, but I had my suspicions.

22  Q.    Okay.  When we say controlled buy, it wasn't really a

23  controlled buy in the sense that you just thought you were

24  going to get drugs from Fred Perry, then was going to sell them

25  to people you thought may be users?

55

1  A.    Yes.

2  Q.    Prior to doing that, nobody told you that they were law

3  enforcement officers?

4  A.    No.

5  Q.    And at least during one of the transactions, you held

6  some of the drugs back for yourself?

7  A.    Yes.

8  Q.    And the other transaction you provided something that was

9  not methamphetamine?

10  A.    Yes.

11  Q.    And why did you do that?

12  A.    Because I thought they were cops.

13  Q.    In any event, you testified during the Fred Perry case

14  under oath that you had not delivered those drugs, correct --

15  let me rephrase that.  At no time during the Fred Perry trial

16  did you try and say that on both occasions the stuff you gave

17  to the officers were drugs, correct?

18  A.   Yes.

19  Q.   You told the jury in the Fred Perry case on the second

20  occasion the stuff that you provided the officers was NoDoz?

21  A.   Yes.

22  Q.   So you didn't lie and say on both occasions I got meth

23  from Fred Perry and passed it along?

24  A.   No.

25  Q.   Now, is it fair to say that in the Titusville area or the

56

1  general area where you're from, the Coulter case is meant to

2  encompass everything, right, all these people, that is the

3  Coulter case?

4  A.   Yes.

5  Q.   And it's also fair to say that you would have provided

6  information about all the people you already indicated you

7  provided information about, prior to you getting up on the

8  stand and testifying about it, correct?

9  A.  Yes.

10  Q.  So what I mean by that is, when you were questioned by

11  the prosecutor in the Fred Perry case and you said Fred Perry

12  told me he got his drugs from Roger Coulter, that's not the

13  first time you shared that information, correct?

14  A.  No.

15       THE COURT:  Had Mr. Coulter been convicted by the

16  time the Perry trial went off?

17       MR. TRABOLD:  We do have Agent Golenberke from BNI

18  is out there.  I don't know the answer to that, your Honor.

19       THE COURT:  All right.

20  BY MR. TRABOLD:

21  Q.  And, also, that holds for the information that you

22  provided about Laraine Donovan, correct?

23  A.  Yes.

24  Q.  You had provided information about Laraine Donovan prior

25  to your testifying?

57

1  A.  Yes.

2   Q.   So separate and apart from cooperating by providing

3   testimony, you provided information about people when you were

4   questioned by law enforcement officers?

5   A.   Yes.

6   Q.   And that would be more people than Fred Perry?

7   A.   Yes.

8   Q.   And the case that you were convicted on, pled guilty and

9   cooperated, just didn't involve Fred Perry, you were charged

10  with a number of other people, correct?

11  A.   Yes.

12  Q.   At least some of those people you provided information

13  on?

14  A.   Yes.

15        MR. TRABOLD:  Nothing further, your Honor.

16        THE COURT:  Anything further?

17        MR. PATTON:  Yes.

18              REDIRECT EXAMINATION

19  BY MR. PATTON:

20  Q.   Mr. Roydes, at the time you were meeting with Agent

21  Golembeski to discuss your testimony at the Perry trial,

22  Laraine Donovan, she had already pled guilty?

23  A.   Yes.

24   Q.   Laraine Donovan was your girlfriend, right?

25   A.   No.


58


1   Q.   You were living with her?

2   A.   Yes.

3   Q.   Okay.  So by the time you gave information to Golembeski

4   regarding Laraine Donovan, who was a co-defendant of yours, she

5   had pled guilty?

6   A.   Yes.

7   Q.   Had Mr. Richards pled guilty by the time you talked with

8   Agent Golembeski?

9   A.   Yes.

10   Q.    So is it fair to say all the co-defendants in the case,

11   other than Perry, had pled guilty by the time you talked to

12   Golembeski?

13   A.   I believe so, yes.

14   Q.    When you were talking with Golembeski -- when you were

15   approached by law enforcement to testify at Mr. Perry's trial,

16   did they tell you that they needed your testimony to convict

17   Ms. Donovan?

18  A.   No.

19  Q.   Did you believe that they needed your testimony to

20  convict Mr. Richards?

21  A.   No.

22  Q.   These people had already pled guilty, is this correct?

23  A.   Yes.

24  Q.   Perry, basically, was the only one that was going to

25  trial?


59


1  A.   Yes.

2  Q.   Do you recall if Coulter had already pled guilty or had

3  been found guilty?

4  A.   He had already been found guilty, yes.

5  Q.   Coulter had gone to trial, is that correct?

6  A.   Yes.

7  Q.   And he had been found guilty prior to the time you talked

8  with Golembeski?

9  A.   Yes.

10      MR. PATTON:  Those are my questions, your Honor.

11      MR. TRABOLD:  Nothing further.

12          THE COURT:  I just have one question for you.  Mr.

13   Roydes, did you ever supply information to a police officer or

14   police officers concerning criminal activity by an individual

15   or individuals concerning which the police officers did not

16   already know?

17          THE WITNESS:  No.

18          THE COURT:  All right.  Thank you, you can step

19   down.

20          MR. PATTON:  We have no further witnesses, your

21   Honor.

22          THE COURT:  Do you have somebody, Mr. Trabold?

23          MR. TRABOLD:  Just briefly, your Honor, I have Agent

24   Golenberke.

25          THE COURT:  Come up front here.  Give your full name


                              60


1   to my court reporter and spell it for him?

2           THE WITNESS:  Robert Golenberke,

3   G-o-l-e-n-b-e-r-k-e.

4             ROBERT GOLENBERKE, GOVERNMENT WITNESS, SWORN

5                   DIRECT EXAMINATION

6  BY MR. TRABOLD:

7  Q.   Sir, where are you are employed?

8  A.   The Pennsylvania Office of Attorney General.

9  Q.   Bureau of Narcotics Investigation?

10  A.   Yes, sir.

11  Q.   How long have you worked there?

12  A.   Since 1999.

13  Q.   And are you familiar with what I'll call the Roger

14  Coulter case?

15  A.   Yes, I am.

16  Q.   Could you give the judge some background for purposes of

17  the record and for purposes of the judge's knowledge about the

18  Roger Coulter case and what that encompasses, when it began,

19  that type of thing?

20  A.   Your Honor, the Roger Coulter case was one of the first

21  methamphetamine cases in Crawford County.  It was in the

22  Titusville area.  Roger Coulter was the ringleader.  He was the

23  one that was manufacturing the methamphetamine.  It was a grand

24  jury investigation conducted by the Office of Attorney General.

25  And, I believe, approximately 20 people were arrested at the

1   conclusion of that investigation.  Many of them were

2   presentments offered by the grand jury.  There were several

3   that were also arrested by criminal complaints.

4   Q.    And would it be fair to say that -- for all those 20

5   people, were they all charged in one indictment or one criminal

6   complaint?

7   A.    No, there were some that were charged as a result of the

8   grand jury investigation.  But there were also others who were

9   charged by criminal complaints.  Those were related cases, they

10  were presented or indicted by the grand jury.

11  Q.    Does law enforcement refer to all the vast swath of

12  people, approximately 20 people, all those people is that

13  referred to as the Roger Coulter case?

14  A.    We refer to the Coulter case quite frequently.

15  Q.    Is that meant to encompass just Mr. Coulter himself or

16  all of the people he was associated with, all 20 or

17  approximately 20 of those people?

18  A.    The entire case.

19  Q.    Even though some of those folks would have been charged

20  separately from Mr. Coulter?

21  A.   That's correct.

22  Q.   Now, were you present on October 20th of 2004 when

23  Officer Peterson interviewed Jeff Roydes?

24  A.   Yes, I was.

25  Q.   Did you take part in all three interviews of Mr. Roydes


                                    62


1   or just some of them or none of them?

2   A.   I was present during at least one of the interviews of

3   Mr. Roydes.

4   Q.   Did you share with Officer Peterson your knowledge about

5   Jeff Roydes' cooperation against other individuals?

6   A.   Yes, I did.

7   Q.   Do you recall what it is you would have told Officer

8   Peterson, to the best of your recollection?

9   A.   I recall Mr. Roydes from the Coulter case.  My contact

10  with the affiant in that case.

11  Q.   Would have been who?

12  A.   Agent Golembeski.

13  Q.   While you were there at the Titusville Police Department

14  on October 20th, you took it upon yourself to call the affiant

15  in the Coulter case, Agent Golembeski?

16  A.   I'm not sure if I was still at the Titusville Police

17  Department, I believe I was.

18       THE COURT:  I didn't hear what you just said?

19       THE WITNESS:  I don't recall if I was inside the

20  Titusville Police Department, your Honor.

21       THE COURT:  A bit of confusion is going to creep in

22  here innocently, Mr. Trabold.  We now have the Coulter case,

23  which he says the police sometimes refer to as the umbrella

24  name for all these individuals cases, but we also do have

25  specifically the Perry case.


                         63


1  BY MR. TRABOLD:

2  Q.   Just for the record, Agent Golembeski, the affiant in the

3  Roger Coulter case, is also referred to as Gumby, just so we

4  have that on the record in case you refer to him that way?

5  A.   That's correct.

6       THE COURT:  Don't refer to him that way.

7       THE WITNESS:  I won't, your Honor.

8  BY MR. TRABOLD:

9  Q.    Now, with regard to Fred Perry, did you share information

10  with Officer Peterson with regard to Mr. Roydes' assistance

11  against Fred Perry?

12  A.    Yes, I did.

13  Q.    And that would have been the assistance -- would that

14  have been assistance where Mr. Roydes testified against Fred

15  Perry?

16  A.    That's correct.

17  Q.    And based on what you know about the large umbrella case

18  of the Coulter case, does the case against Fred Perry, which

19  Jeff Roydes was part of, does that fall under the large

20  umbrella that you know to be the Coulter case?

21  A.    Yes, Mr. Perry was involved with Mr. Coulter.

22  Q.    And the reason for that is because Mr. Perry's source of

23  methamphetamine was Roger Coulter?

24  A.    That's correct.

25  Q.    And that information that you had on Mr. Roydes'


64


1  assistance that you had in the Fred Perry matter, was shared by

2  you to Officer Peterson the night the search warrant was

3  executed on Mrs. Woods' house?

4  A.   I shared information with him as he was typing his

5  affidavit or prior to that.

6  Q.   Based on your recollection, was that search warrant

7  approved by the Venango County DA's Office?

8  A.   I believe that it was.

9  Q.   Is that relatively standard protocol for being and/or the

10  local police departments you work with to attempt to seek

11  approval from the DA's Office?

12  A.    That's BNI's policy when we're dealing with task force

13  officers, they take them to the district attorney.

14       MR. TRABOLD:  Nothing further, your Honor.

15       MR. PATTON:  Your Honor, if I could review the

16  agent's report.

17       THE COURT:  All right.

18             CROSS-EXAMINATION

19  BY MR. PATTON:

20  Q.   Agent, I'm sorry, your name is pronounced Golenberke?

21  A.   Yes, sir.

22  Q.   Agent Golenberke, you said that you had participated in

23  at least one of the interviews of Mr. Roydes at the Titusville

24  Police Department, correct?

25  A.    That's correct.


65


1  Q.    And in that interview, Mr. Roydes admitted to you that he

2  had been using methamphetamine, correct?

3  A.    That's correct.

4  Q.    And he had been using it very, very recently?

5  A.    I believe that he stated he used it Sunday evening prior

6  to the interview.

7  Q.    The interview would have been on?

8  A.    I'm not sure of the date of the interview, I think

9  Sunday's date was the 16th, I believe, this was Wednesday of

10  that week.

11  Q.    Wednesday the 20th.  He said he had used methamphetamine

12  on Sunday?

13  A.    Yes.

14  Q.    I believe you said that you contacted Agent Golembeski,

15  who was also an agent with the Bureau of Narcotics

16  Investigation, is that correct?

17  A.    That's correct.

18  Q.    Was that before you or after you had talked with Roydes?

19  A.  After.

20  Q.  What specifically did you and Agent Golembeski discuss?

21  A.  I recall Mr. Roydes in the Coulter case, I asked Agent

22  Golembeski specifically how he had cooperated in the case.

23  Agent Golembeski informed me that he had testified against Fred

24  Perry, Fred Perry was convicted as a result of that.  He also

25  provided information on approximately three other persons.  But

66

1  he wasn't required to testify in those cases.

2  Q.  Did Agent Golembeski identify these three other persons?

3  A.  Yes.

4  Q.  Who were they?

5  A.  Shawn Adams, Rickey Richards and Renie Donovan.  I

6  believe all three pled guilty.

7        THE COURT:  Shawn Adams, who were they again,

8  please?

9        THE WITNESS:  Rickey Richards, your Honor.

10        THE COURT:  Okay.  Who was the last one?

11        THE WITNESS:  Renie Donovan.

12        THE COURT:  Renie?

13          THE WITNESS:  Renie, it's a female, R-e-n-i-e, I

14  believe it would be spelled.

15          THE COURT:  Were these people part of the "Coulter"

16  case, do you know?

17          THE WITNESS:  Yes, your Honor.

18  BY MR. PATTON:

19  Q.    Renie Donovan actually is Laraine Donovan?

20  A.    That would be the name.

21  Q.    Who was actually a co-defendant of Mr. Roydes in Mr.

22  Roydes' case?

23  A.    I'm really not certain, I just know he had given

24  information on those parties, but they pled guilty before he

25  was called to testify.


                              67


1  Q.    Did Agent Golembeski inform you that at least Mr.

2  Richards and Ms. Donovan had pled guilty before Mr. Roydes gave

3  any information about them?

4  A.    No, that wasn't what he said.

5  Q.    Did Agent Golembeski tell you that in the -- presentment

6  number 21 of the 14th statewide investigative grand jury, that

7   evidence was presented to the grand jury and the grand jury had

8   already found information that Rickey Richards was supplying

9   methamphetamine to Agent York in an undercover capacity, did

10  Agent Golembeski tell you that?

11      MR. TRABOLD:  Objection, what is the relevance of

12  that.  What's the relevance of a presentment by a grand jury

13  against Rickey Richards.

14      MR. PATTON:  It was attached to a police complaint

15  charging Mr. Woods that's signed by Agent Golembeski, and it's

16  attached to that criminal complaint.

17      THE COURT:  All right, I'm going to let the question

18  go.  But let me ask you question here.  First of all, why did

19  you call Agent Golembeski, what was your purpose?

20      THE WITNESS:  I wanted to ascertain the reliability

21  of Mr. Roydes, how he cooperated in the past, your Honor.  I

22  was familiar with him, I believe he cooperated but I wanted the

23  details from Agent Golembeski.

24      THE COURT:  When Agent Golembeski mentioned Shawn

25  Adams, Rickey Richards and Renie Donovan, did he tell you that

68

1  information which Mr. Roydes had supplied had led to their

2  arrests and convictions?

3       THE WITNESS:  He told me that Mr. Roydes was

4  prepared to testify against those persons, but they pled

5  guilty, he wasn't called to testify, but he had given a

6  statement regarding them.

7       THE COURT:  All right, go ahead.

8  BY MR. PATTON:

9  Q.   So Golembeski told you that Mr. Roydes had provided

10  information to Golembeski about Richards, Adams and Donovan,

11  before Richards, Adams or Donovan pled guilty?

12  A.   That's correct.

13  Q.   And that it was subsequent to Roydes providing that

14  information, that Richards, Adams and Donovan pled guilty?

15  A.   That's correct.

16  Q.   Did you discuss with Agent Golembeski the specifics of

17  Roydes' testimony in the Perry case?

18  A.   No, just that Perry was convicted in the case.

19  Q.   Is it fair to say that while you thought you knew Roydes

20  and you thought he had been involved somehow in the Coulter

21  case, you did not know any of the specifics of that?

22  A.  I knew Roydes and I knew that he was involved in that

23  Coulter case.  But I did not know the specifics, as far as the

24  information that he provided Agent Golembeski.

25  Q.  And you didn't know specifics about his testimony in the

69

1  Perry trial?

2  A.  No.

3  Q.  And you didn't find out the specifics of Roydes'

4  testimony in the Perry trial during your conversation with

5  Agent Golembeski?

6  A.  Just that the case was successful and Mr. Roydes

7  participated in the case.

8  Q.  But nothing beyond that?

9  A.  His testimony was truthful and honest.  Agent Golembeski

10  stated that he was truthful when he testified.

11  Q.  What did he base that assessment on?

12  A.  That he believed his testimony was truthful.

13  Q.  That Agent Golembeski believed Roydes' testimony was

14  truthful?

15  A.  That's correct.

16  Q.    Do you know when Agent Golembeski first spoke with Mr.

17  Roydes?

18  A.    No, I don't.

19  Q.    Do you know when Rickey Richards pled guilty?

20  A.    No, I don't.

21  Q.    Do you know when Shawn Adams pled guilty?

22  A.    No, I don't.

23  Q.    Do you know when Laraine Donovan pled guilty?

24  A.    No, I don't.

25  Q.    Did you relay the information you received from Agent


70


1  Golembeski to anyone?

2  A.    To Officer Peterson of the Titusville Police Department.

3  Q.    Did you read Officer Peterson's affidavit before it was

4  submitted to the District Attorney's Office?

5  A.    I don't recall, I don't believe that I did.

6  Q.    You don't know, you personally don't know if Mr. Roydes

7  provided information about Rickey Richards prior to Mr.

8  Richards pleading guilty, correct?

9  A.    I wasn't present during the interview.

10  Q.    So you don't know, correct?

11  A.    Not firsthand.

12  Q.    You don't know whether Mr. Roydes provided information

13  regarding Shawn Adams prior to Shawn Adams pleading guilty?

14  A.    I know that he provided information, but I'm not certain

15  of the dates.

16  Q.    And you don't know yourself whether Mr. Roydes provided

17  information to Agent Golembeski about Laraine Donovan prior to

18  Laraine Donovan pleading guilty?

19  A.    I'm not certain of the dates, counselor.

20        MR. PATTON:  May I have a moment, your Honor.

21        THE COURT:  Yes.

22        MR. PATTON:  Those are my questions, your Honor.

23              REDIRECT EXAMINATION

24  BY MR. TRABOLD:

25  Q.    Agent Golembeski told you that Mr. Roydes provided


71


1  information against Adams, Donovan and Richards that led to

2  their conviction?

3  A.    They pled guilty.

4   Q.   And he was a part of that process of prosecuting them?

5   A.   That's correct.

6   Q.   In fact, Mr. Roydes was charged in a conspiracy with at

7   least a couple of those people?

8   A.   That's correct.

9        MR. TRABOLD:  Nothing further, your Honor.

10       THE COURT:  Did Agent Golembeski express an opinion

11   to you in the course of that conversation as to the veracity or

12   reliability of the information which Roydes gave relative to

13   the three individuals we were just talking about?

14       THE WITNESS:  Yes, your Honor, Agent Golembeski

15   strongly believed that he was reliable.  That his information

16   was reliable in the past.

17       THE COURT:  Mr. Trabold asked you a question, he

18   asked you did he tell you that the information led to their

19   arrest and/or conviction.  And then you were ships passing in

20   the night.  Did he tell that to you or did he simply tell you

21   that he supplied information to him concerning those

22   individuals before they were convicted; do you understand what

23   I'm saying?

24       THE WITNESS:  I understand, your Honor.  I'm not

25   sure of the date.

72

1        THE COURT:  I know you're not, but I'm just asking

2    what you were told by him.  Did he tell you that Roydes

3    supplied information concerning those individuals prior to

4    their convictions?

5        THE WITNESS:  I don't recall him specifically

6    stating that, your Honor.  I do recall Agent Golembeski telling

7    me that he provided information against those three people, and

8    they all pled guilty.  I'm not sure that I asked the question

9    did he give a statement before they pled guilty.  I guess I

10   believed that at the time.

11       MR. TRABOLD:  Can I just follow-up on that.

12       THE COURT:  Yes.

13   BY MR. TRABOLD:

14   Q.   Was the implication to you that these three people pled

15   guilty subsequent to Mr. Roydes providing the information?

16   A.   The way the statement was made to me, that's what I would

17   believe, that he gave a statement and he was prepared to

18   testify against them.  They pled guilty, I would believe as a

19   result as of this person that was going to testify against

20  them.

21  Q.   In the ordinary course of conversation and cooperation

22  discussions between law enforcement officers, one officer

23  doesn't provide the date that a person pled guilty and

24  reference that with regard to another's cooperation, correct;

25  it would have been out of the ordinary for Agent Golembeski to

73

1  say Mr. Adams pled guilty on October 1st and Mr. Roydes

2  provided information prior to that?

3  A.   We don't normally talk to each other like that.

4  Q.   I mean by that, what did you take it to mean when Agent

5  Golembeski said to you he provided information and these people

6  pled guilty?

7  A.   I believed that they pled guilty as a result of his

8  cooperation.

9      MR. TRABOLD:  Thank you, your Honor.

10     THE COURT:  Anything else?

11     MR. PATTON:  Yes, your Honor.

12         RECROSS-EXAMINATION

13  BY MR. PATTON:

14    Q.    Did Agent Golembeski tell you that specifically that

15    Roydes provided information and they then pled guilty after

16    that?

17    A.    Counselor, I don't think we had a conversation that

18    specific.  As I answered your Honor's question, that when I

19    spoke to Agent Golembeski, he stated that Mr. Roydes had

20    cooperated in the past against these people and they pled

21    guilty.  I didn't ask him anymore questions specifically.  I

22    was trying to determine if Mr. Roydes was reliable or not or if

23    he had provided information in the past.

24    Q.    And you relied on Agent Golembeski's opinion that Roydes

25    was truthful?


                                74


1    A.    That's correct.

2    Q.    But you don't know the timing and the dates of when

3    Roydes gave information and when Donovan, Adams pled guilty?

4    A.    No, I don't.

5         MR. PATTON:  Those are my questions, your Honor.

6         THE COURT:  How long did you know Agent Golembeski?

7         THE WITNESS:  I've known Agent Golembeski --

8          THE COURT:  How long had you known Agent Golembeski

9    before you placed the phone call to him on October 20th?

10          THE WITNESS:  I've known Agent Golembeski since

11    1998, your Honor.

12          THE COURT:  Had you, prior to that time, ever had an

13    occasion to contact him or rely upon him for his assessment

14    concerning the veracity and reliability of CIs?

15          THE WITNESS:  I know Agent Golembeski very well,

16    your Honor, we worked closely together at that time.  I trust

17    his judgment of other people involved in the criminal justice

18    system.

19          THE COURT:  Had you ever contacted him before

20    concerning satisfying yourself that a CI was reliable?

21          THE WITNESS:  Yes, we've had numerous conversations.

22          THE COURT:  Anything else of this witness, Mr.

23    Patton?

24          MR. PATTON:  No, your Honor.

25          MR. TRABOLD:  No, your Honor.


                                    75


1          THE COURT:  Thank you, sir.  Is that it?

2          MR. TRABOLD:  That's it, your Honor.

3          THE COURT:  All right.  Mr. Patton, do you have

4   anything you want to tell me?

5          MR. TRABOLD:  Your Honor, I want to make it clear

6   I'm assuming that the issue with the August search is purely a

7   legal issue?

8          THE COURT:  It is purely a legal issue, one of which

9   I think I have a pretty good handle on.

10         MR. PATTON:  Your Honor, I don't have any new

11   argument to make to you beyond --

12         THE COURT:  Let's go backwards.  Let's talk about

13   Franks.  Requires recklessness and materiality?

14         MR. PATTON:  Your Honor, what was specifically told

15   to the magistrate in the affidavit was that the CI had been a

16   witness for the Attorney General in drug prosecutions.  Well,

17   it says he/she was a witness for the Attorney General's Office

18   in the prosecution of drug cases.  Well, even under the

19   government's evidence from what I heard, he was a witness --

20   what I would say the classic sense of the term witness means

21   you came in and testified against someone in one case.  There

22   were not drug cases.  So that in and of itself is misleading.

23  And it is misleading -- the implication of that statement is

24  that he provided testimony that was crucial to a conviction and

25  it was testimony that established that somehow this person was

76

1  a reliable source of information.  When you find out that in

2  fact what the testimony was, was Roydes saying yes, the state

3  troopers bought methamphetamine off of me one time, that I got

4  from Fred Perry, which they knew because they took me to Fred

5  Perry's house and they saw me meet with Fred Perry again, that

6  doesn't establish Mr. Roydes as a reliable source of

7  information.

8        Mr. Roydes testifying that he had provided on

9  another occasion NoDoz to the officers who thought it was

10  methamphetamine, does not establish Roydes as a reliable source

11  of information.  And that any reasonable officer who knew what

12  the substance of Roydes' testimony was, would have understood

13  and known that that would have been important for the issuing

14  magistrate to know.

15        If you are going to try and rely on a witness's

16  testimony in a criminal case to establish the person's

17  reliability, you need to give some information about what that

18  testimony was.  As far as this statement goes, you could be a

19  witness in a drug prosecution by simply saying yeah, I was

20  coming out of the hardware store and I saw these two people

21  talking with each other this particular day.  And that may be

22  all you have to offer for the case.

23        Now, the prosecution might use that testimony in

24  other ways to link that up as being an important issue, but in

25  and of itself that statement doesn't mean much at all.  But

77

1   what the officer is trying to use it for is to say hey, you can

2   believe that Roydes is a credible source of information because

3   he's testified as a witness before.  Well, if you're going to

4   do that, then if you know all his testimony was, well, yeah

5   they made controlled buys off of me, that doesn't bolster his

6   credibility and any reasonable officer would know that, so that

7   is a material omission.  They can say, Officer Peterson can

8   say, well, I didn't know what the substance of the testimony

9   was.

10        Then Peterson said I was relying on Golenberke.

11   Golenberke says I was relying Golembeski.  Well, since

12   Golembeski was the officer in the case, he should have known

13   what the substance of the testimony was, and so that now is

14   imputed down the line to Officer Peterson.  That is a

15   well-established idea in Fourth Amendment law, obviously --

16   otherwise, the police officers could simply shield information

17   from the judge by putting an innocent dupe in the middle of the

18   chain.

19          THE COURT:  I agree with that.

20          MR. PATTON:  So I do believe that that shows a

21   reckless omission from the warrant.  And it's material in that

22   if you add that information in --

23          THE COURT:  Meaning?

24          MR. PATTON:  Meaning he was a witness for the

25   Attorney General's Office in the prosecution of drug cases and


78


1   that he testified about controlled purchases that the state

2   police made from him and/or provided information about people

3   who had already pled guilty to the charges that he had

4   testified to, that statement then, initially the magistrate

5  would have looked at that and said well, okay, so what, he

6  testified about controlled buys that he made off of him, so

7  that doesn't do anything to convince me that the person is

8  reliable.

9       THE COURT:  What about Golenberke, what about his

10  testimony about what he was told by Golembeski about his

11  alleged truthful cooperation relative to the three individuals

12  that pled guilty?

13       MR. PATTON:  Well, number one, that wasn't put in

14  the affidavit.

15       THE COURT:  So you're saying that's in their mind?

16       MR. PATTON:  Correct.  That information is never put

17  into the affidavit.  Now, to the extent you want to argue that

18  well, that is part of being a witness for the Attorney

19  General's Office.

20       THE COURT:  It says "confidential informant has

21  proven to be a reliable source of information in the

22  investigation and prosecution of drug cases."

23       MR. PATTON:  This kind of bleeds over into the

24  argument that that statement in and of itself is a mere

25  conclusion that doesn't carry any weight.  Because that is all

1  Golenberke got from Golembeski.  Was Golembeski saying, hey, I

2  think the person is reliable.  And then Golenberke saying --

3  Golembeski, I trust him, so yeah I accept his belief that the

4  person is trustworthy.  That gets passed to Officer Peterson.

5  Peterson just puts in a bare conclusion that the person has

6  been proven to be reliable.

7       Roydes specifically testified in front of you that

8  at the time he talked with Golembeski, that Richards had pled

9  guilty and Donovan had pled guilty, and they were his

10  co-defendants.  As was Perry.  Perry was the only one who

11  hadn't pled.

12       You also have, I'm not going to read it to you

13  because it's attached to our material, you have that

14  presentment from the grand jury that lays out all the

15  information that they already had.  Richards gave the state

16  police some methamphetamine, but also hooked them up with Renie

17  Donovan, who was related to him in some way.  She gave them

18  some meth.  But then also put them in touch with Roydes.  He

19  was living with her.  And then Roydes had the controlled

20  delivery.  So this wasn't any information that the police

21  didn't already have.

22          And Roydes specifically explained to you that he was

23  interviewed, he already had been in jail for a year and a half

24  by the time he spoke to Golembeski, look, these other people

25  had already pled guilty.  Including Coulter, Coulter had

80

1  already pled guilty by the time that Roydes gave information

2  about Coulter.

3          THE COURT:  Just to put a capper on this part of the

4  conversation, are you saying that the record shows that

5  Golembeski, who was the initial feeder of information up the

6  line for reliability, he himself was possessed of no

7  information from which he or for that matter a reasonable

8  magistrate could reach a conclusion as to Roydes veracity?

9          MR. PATTON:  There isn't information in this record

10  to support that conclusion.  Obviously, we didn't hear from

11  Golembeski.  You heard from Agent Golenberke, who says when he

12  actually has to get down and say what was said, what he said is

13  Roydes gave information about these people, these people had

14  pled guilty.  But Golenberke cannot say look, I don't know what

15  the timeframe of that was.

16        THE COURT:  Can't one cop rely on another cop he

17  knows for an assessment of a CI's reliability?

18        MR. PATTON:  Sure, if they want to, but a judge

19  can't.  Otherwise, you're letting the police officers decide

20  who's a reliable source of information for giving an affidavit.

21        THE COURT:  It still gets back to what's put down on

22  the paper?

23        MR. PATTON:  Exactly.  And we have the case law put

24  in our motion, we have an order of Judge Lancaster that pulls

25  our case law together in a somewhat similar situation.  This


81


1  states that if a person has proven to be a reliable informant,

2  is nothing other than a police officer's opinion as to that

3  person's credibility.  And the Supreme Court in Gates
                                                   _____

4  specifically says that that is not sufficient.  The police

5  officers have to give the issuing magistrate facts to support

6  that conclusion.  Facts such as this informant gave information

7  about, and they don't have to name the individuals, has given

8   information on three cases where we used that information to go

9   and get a search warrant and the items that he said would be

10  there were found there.  Or the person gave testimony that was

11  then directly used to obtain a conviction.  Facts such as those

12  so that the issuing judicial officer can look at those facts

13  and make a decision for themselves, do those facts support a

14  conclusion that a confidential informant is reliable.

15      THE COURT:  But couldn't a reasonable magistrate

16  when he or she read had been a witness for the prosecution, had

17  been a witness for the Attorney General's Office in the

18  prosecution of drug cases, a reasonable conclusion by the

19  magistrate would be that the person had given truthful

20  testimony and helped, wouldn't it?

21      MR. PATTON:  No.  That's one possibility.  You have

22  to say more than that.  Especially if you know that what that

23  testimony is is the guy simply saying the police bought drugs

24  from me or what I sold them were drugs.  Even if that -- a

25  judge says okay, I believe that testimony may have been true,


82


1   then the next question from there is, okay, so he testified

2  truthfully that the police had made controlled purchases or had

3  made undercover purchases from him.

4        What does that tell me about whether or not he is a

5  reliable source of information in general, not very much.

6  Really nothing at all.  If someone is coming and saying yeah,

7  they got me, I sold them drugs or on a second occasion I sold

8  them, what I sold them were drugs, doesn't do anything to

9  establish the person's reliability.  That's why you have to put

10  the actual facts in so that the issuing magistrate can weigh

11  those facts and make a decision.  Because while you have to

12  give deference to an issuing magistrate's probable cause

13  decisions, you can see what's in the affidavit and an issuing

14  magistrate cannot simply accept the police officer's conclusion

15  that the CI is reliable, that is not allowable.

16        THE COURT:  But getting back to this Gates case,
                                                  _____

17  which did away with the Aguilar two-pronged test and went to
                             _____

18  the totality of the circumstances test.  What about the level

19  of particularity in the warrant and the fact that her husband

20  was in jail, per the warrant, for methamphetamine, does that

21  help?

22          MR. PATTON:  No, because the level of particularity

23   that was given was that she has this stuff in the house that is

24   used to make methamphetamine.  Basically, it comes down to

25   Officer Peterson says I know how you make meth and I listened


83


1   to this guy describe how to make meth, and he knows how to make

2   meth.

3          Well, what did he tell you today.  That in their

4   intelligence briefings leading up to and prior to October 20th,

5   Roydes' name came up repeatedly as being someone who's involved

6   with the manufacture of methamphetamine.  So simply because

7   Roydes knows how to make methamphetamine, doesn't make him a

8   reliable source of information.  Especially, they know he has

9   been a source, before he comes in on October 20th, they know

10   that he's involved with the manufacturing of methamphetamine.

11   So simply because he knows how to make meth doesn't show him to

12   be reliable at all with regard to the information that he's

13   providing about Ms. Woods in that meth manufacturing going on

14   as Ms. Woods' house.  If that were the case, I know how to make

15   methamphetamine.  I mean, I could go into the police and say,

16   look, Judge Sean McLaughlin has got a big meth lab going on in

17   his house, this is how he's doing it.  He's either doing it by

18   this method, I'd you were going out and buying a bunch of

19   pseudoephedrine pills, having people go buy litium batteries

20   for you and you had somebody else stealing anhydrous ammonia

21   for you and mixing it up.  You also then had bottles with a

22   tube coming out of the top so you could gas it.

23        THE COURT:  Mr. Trabold is paying very close

24   attention to your level of knowledge concerning this particular

25   area.


84


1        MR. PATTON:  Well, I had a DEA agent tell me after a

2   trial that they were going to investigate me.

3        THE COURT:  I have your point on that.  One last

4   thing.  Where is the evidence of knowledge that I could

5   reasonably find in this case of knowledge of intent to falsify;

6   in other words, motive to lie?

7        MR. PATTON:  There is none.  I will concede that

8   Officer Peterson has testified that he did not know of the

9   harassment charge that was filed at the Corry State Police

10  barracks the day before.  And, well, Mr. Roydes testified that

11  he didn't inform him.  Mr. Roydes testified he knew that it had

12  been filed and he did not tell Officer Peterson that.  So the

13  testimony does not support a finding that they knew that there

14  was a motive to lie.

15       THE COURT:  One last thing.  On what point of

16  omission or addition in the affidavit, what is reckless?

17       MR. PATTON:  Well, based on what is reckless is not

18  putting in the information about the substance of Roydes'

19  testimony.  And it is material because if that information is

20  put in, then the statement that he's been a witness for the

21  Attorney General's Office basically ends up meaning nothing.

22  Because once you find out that all he did was testify about

23  undercover buys made from him, then he doesn't add anything to

24  his credibility.  And then all you're left with is the

25  statement the confidential informant has proven to be a

85

1  reliable source of information in the investigation and

2  prosecution on drug cases.  And we have laid out a legion of

3  case law that says that is not sufficient.

4          And it is important to understand, I mentioned this

5   previously before, although you have to give deference to the

6   issue of a magistrate's probable cause determination, it is

7   black letter law that a bare conclusion that a CI is reliable

8   is not sufficient to establish that person's reliability.

9          THE COURT:  Even after Gates?

                    _____

10         MR. PATTON:  Yes, it says it in Gates.

                    _____

11         THE COURT:  All right, let me hear from your

12   compatriot.

13         MR. TRABOLD:  Judge, first we need to get clear on

14   the record what the record establishes.  Counsel wants to argue

15   that the record establishes that Mr. Roydes' testimony, when he

16   testified in the Fred Perry case, was simply that he made

17   controlled purchases or he sold drugs to what he now realizes

18   to be undercover law enforcement officers.  That is not all

19   that he testified to.  What would be the point of that in your

20   testimony, that testimony would be meaningless.  What Mr.

21   Roydes testified to is that the substances, at least in the

22   first instance that he sold to the undercover law enforcement

23   officers, came from Fred Perry.

24         Now, it is of no moment counsel says, well, the

25  officers already knew that because they were there with him

86

1   when he went into Fred Perry's house.  Well, that's

2   meaningless.  The information he provided was that Fred Perry

3   was the source of his drugs.  Not just that the drugs that he

4   had he then sold to law enforcement officers.  So it not

5   factually accurate to paraphrase Mr. Roydes' testimony as

6   merely dealing with him going and making sales to undercover

7   law enforcement officers, because that's not all he testified

8   to.

9         He testified to a great deal more than that.  He

10  testified in the first instance that Fred Perry was his source.

11  He also testified and provided specific details that not only

12  did he know Fred Perry to be his source, but he knew Roger

13  Coulter to be Fred Perry's source because that's what Fred

14  Perry told him.

15        He also testified that, and it's right in his

16  testimony, that not only was he involved in the conspiracy, but

17  there were also other people involved in the case with him.  He

18  was asked a question:  "And the conspiracy count against you,

19  sir, deals with activity that you engaged in from December of

20  '99 to March 31st of 2001, correct?  Yes.  With Ricky Richards,

21  Lorraine Donovan and Fred Perry?  Yes.  And others, correct?

22  Yes."  He's not just providing information on Fred Perry, he's

23  providing information on a whole lot of other people.

24       The argument counsel made in his pleadings, he even

25  attached an affidavit from Mr. Roydes, was that all Mr. Roydes


87


1  did was provide information on Fred Perry.  Now, when we come

2  to the hearing and it's made abundantly clear that Mr. Roydes

3  provided information against a whole lot of other people

4  besides Fred Perry, now the argument is well, he provided that

5  information after they pled guilty.  What is the significance,

6  first of all, the record does not bear that out.  Second of

7  all, that is of no significance whatsoever when he provided the

8  information.

9       But I want to focus on most specifically, the record

10  does not bear out that Mr. Roydes provided information on

11  people after they pled guilty.  Otherwise, the conversation

12  between the BNI agents would be fanciful in the extreme.  And,

13    of course, Agent Golembeski is not going say to Agent

14    Golenberke, look, Mr. Roydes provided information against these

15    three people prior to them pleading guilty and that is why they

16    pled guilty.  Obviously the implication in the ordinary course

17    of discourse is the reason these folks were convicted had at

18    least in part to do with Mr. Roydes' cooperation.

19          So the whole thrust of counsel's pleadings in this

20    case is that Mr. Roydes only testified or provided assistance

21    against one person and that person would be Fred Perry.  Well,

22    the record does not bear that out and it's not even close to

23    bearing that out.

24          THE COURT:  To put it in a nutshell, his big

25    complaint, meaning Mr. Patton's, is whatever may have been said


88


1    between the police officers, except maybe insofar it may relate

2    to the question of good faith, is irrelevant for purposes of

3    judging the facial validity of the warrant unless it got down

4    in the warrant, and he says that paragraph beginning the

5    confidential informant is conclusory?

6          MR. TRABOLD:  It is not conclusory.  It indicates

7  that he is reliable and he is reliable because he was a witness

8  in investigations and prosecutions in the past.

9       THE COURT:  As opposed to somebody saying in my

10  opinion he's reliable?

11       MR. TRABOLD:  Yes.  Of course there could always be

12  more information.  But the paragraph that relates to Mr.

13  Roydes' liability is not conclusory.  It indicates in a

14  factually accurate way based on the record we have here today

15  that Mr. Roydes was a witness in the investigation and

16  prosecution of drugs cases.

17       THE COURT:  He says that is misleading, at most it

18  was a case?

19       MR. TRABOLD:  Which is factually inaccurate based on

20  the record you have before you here today.  Based on the

21  testimony from Agent Golenberke, who received information from

22  Agent Golembeski, with regard to three people, as well as Mr.

23  Roydes providing information on Mr. Perry, and on the other

24  three people that he was charged in the conspiracy with, which

25  he testified to in the Fred Perry case.  There's no case cited

89

1  by counsel, that I'm aware of, in his pleadings that says,

2  well, the person had to have provided the information prior to

3  the subject of his testimony pleading guilty.

4         THE COURT:  One other question, then we're done.

5  And I'm not going to do a bench opinion on this, I'm going to

6  issue a written opinion, I've got to read the transcript.  What

7  about his point that they say they interviewed him, they knew

8  he was active in the meth community and demonstrated knowledge

9  and manufacturing of meth.  So Mr. Patton's point runs well, if

10  that's true, it's not startling that he would be able to rattle

11  off the means and methods by which he was allegedly

12  manufacturing meth?

13         MR. TRABOLD:  Well, the affidavit without question

14  does not just say that Mr. Roydes knew how to manufacture meth

15  and shared that that's what Mrs. Woods was doing.  It indicates

16  specific rooms and locations in the house where Mr. Roydes

17  points out where precursor chemicals or items necessary to the

18  production of methamphetamine are located.

19         Mr. Roydes --  I would point out, number one, with

20  regard to the Gates totality of the circumstances test.  This
          _____

21  information could not be fresher.  It would be almost

22    impossible for Mr. Roydes to provide more up-to-date

23    information than he provided in the case.  Which leads to a

24    finding of probable cause.  Mr. Roydes provides information,

25    specific information, number one, with regard to his knowledge

90

1    of the methamphetamine production process occurring within Mrs.

2    Woods' house.  He breaks down specifically the items that he

3    saw in Mrs. Woods' house.

4        And he then goes further than that.  He then breaks

5    down and specifically indicates where he saw various items in

6    Mrs. Woods' house.  Just by a quick reading of the affidavit,

7    he indicates a beaker on the stove.  He also indicates that he

8    saw a number of items, including iodine in a mason jar, a bag

9    of pills, which he believed were pseudoephedrine, some of which

10   were crushed, some were whole, that these items were located in

11   a safe in Lynda Woods' bedroom.  Which he then indicates where

12   her bedroom is.

13       He also indicates, to go even further than that, the

14   specific timeframe when he knows her to have been producing

15   methamphetamine.  It's not just a case where he comes in and

16  says Lynda Woods is producing meth, that is how she's doing it.

17  He says Lynda Woods is producing meth, these are the items she

18  has in her house, and this is where those items are in her

19  house.  And this is when she produces methamphetamine.

20       So, your Honor, on the record in this case the

21  record bears out that enough information was provided in this

22  affidavit to find probable cause.

23       The only other point I just quickly want to cover is

24  good faith in this case.  And good faith applies in this case.

25  The good faith exception is designed for those officers that

91

1  really just by, do not really engage in misconduct, but one

2  could say well, geez, you didn't meet the bar of probable

3  cause.  And really the exclusionary rule, as the case even

4  cited by counsel, the Zimmerman case makes clear, the
                    _____

5  exclusionary rule is designed to deter police misconduct that

6  violates the Constitutional rights of citizens.

7       What is the police misconduct in this case.  There's

8  a search warrant, the police provide it to the District

9   Attorney's Office, they go back and forth to make sure it's

10  okay, they then execute the search warrant.  There is no police

11  misconduct in this case.  But even if there was, you should

12  find, based on the good faith exception in this case, that the

13  warrant is completely appropriate and that the exclusionary

14  rule should not apply.  Because the situations identified by

15  counsel in his pleading are not applicable to this case.

16          The Zimmerman case lays out four factors and I

17  believe in counsel's pleading he references --

18          THE COURT:  The Leon factors?

19          MR. TRABOLD:  Correct.  And only factors one and

20  three of Leon apply to this case.  Factor one is where the

21  magistrate issued a warrant and relies on a deliberately or

22  recklessly false affidavit.  There's no evidence that this

23  affidavit was deliberately or recklessly false.  There's no

24  information, there's no evidence that the affidavit was false,

25  let alone deliberately or recklessly.


                                92


1           Finally, on the third point, where the warrant is

file:///A|/WOODSUPP.TXT

2  based on an affidavit so lacking in indicia of probable cause

3  to render official belief that it's existence is entirely

4  unreasonable.  That is not even close in this case.  This is a

5  specific warrant, where the officers indicate why they believe

6  the witness to be reliable.  With information that occurs mere

7  days prior to the execution of the search warrant.

8        So my point to you is whether you want to find that

9  the burden has not been met to suppress this evidence based on

10  the Franks case or you want to find that the good faith

11  exception applies in this case, under either circumstance this

12  evidence should not be suppressed.

13        THE COURT:  All right.

14        MR. PATTON:  Your Honor, can I make one other point?

15        THE COURT:  Yes, go ahead.

16        MR.  PATTON:  If you read the statement, it says he

17  was a witness for the Attorney General's Office in the

18  prosecution of drug cases.  It doesn't say that a conviction

19  was obtained in the case he testified in.  For all the

20  magistrate knew the jury found the person not guilty and

21  completely rejected the guy's testimony.  It doesn't even say

22  the guy was convicted, so in the statement that is in the

23  affidavit, all it says is he was a witness for us.  Doesn't say

24  what the result of the case was.  So even if you just look at

25  the face of it, that statement at most all it says is well, the

                                    93

1  prosecutor thought the guy was truthful enough to put on the

2  stand.

3          THE COURT:  All right.  Thank you, counsel.

4

5          (Whereupon, at 12:02 p.m., the proceedings were

6  concluded.)

7

8                   - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

94

1               C E R T I F I C A T E

               _ _ _ _ _ _ _ _ _ _

2

3

4      I, Ronald J. Bench, certify that the foregoing is a

5  correct transcript from the record of proceedings in the

6  above-entitled matter.

7

8

9

10 _____

11  Ronald J. Bench

12

13

14

15

16

17

18

19

20

21

22

23

24

25