IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

   v.        CRIMINAL NO. 04-54 ERIE

LYNDA LORRAINE WOODS

STATUS CONFERENCE

Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Thursday, May 19, 2005.

APPEARANCES:
    CHRISTIAN A. TRABOLD, Assistant United States
    Attorney, appearing on behalf of the Government.

    THOMAS W. PATTON, Assistant Federal Public

Defender, appearing on behalf of the Defendant.

Ronald J. Bench, RMR - Official Court Reporter

2

1         PROCEEDINGS

2

3         (Whereupon, the proceedings began at 11:45 a.m., on

4  Thursday, May 19, 2005, in Courtroom C.)

5

6         THE COURT:  We have a suppression hearing on Woods

7  scheduled for next week, I think Wednesday.  And I've read

8  through the papers, I haven't been through them with a fine

9  tooth comb, that I will before the hearing.  The first thing is

10 a real simple time question, how long do you think this is

11 going to take?

12        MR. TRABOLD:  The issues are to me pretty

13 significantly confined to what's in the search warrant.  I

14  don't anticipate it being a lengthy hearing at all.  But I

15  always seem to underestimate, in comparison to what Tom may

16  expect.

17        THE COURT:  Are we going to have a number of

18  witnesses -- what do you think?

19        MR. PATTON:  Your Honor, we would expect probably

20  two witnesses.

21        THE COURT:  All right, it's scheduled early, it will

22  be what it will be.  Here's my other question.  I'm confused

23  now that I've read these papers.  The problem is probably mine.

24  But let me see if I get this right.  This is by way of maybe

25  honing in on our discussion for next week.  The officers here

3

1  go out to this place on August 17th, and that is pursuant to a

2  discussion they had with the husband?

3        MR. TRABOLD:  Correct.

4        THE COURT:  The husband says hey, by the way,

5  there's more meth equipment and stuff out there.  So they go

6  out and your client is there and she gives a consent.  And they

7  promise her in connection with that consent that nothing they

8  find will be used against her?

9       MR. PATTON:  That's correct.

10      THE COURT:  So, I gather, they searched and they do

11 find some other things, is that right?

12      MR. TRABOLD:  They go there that day and basically

13 are provided the methamphetamine making materials.

14      THE COURT:  On the 17th you mean?

15      MR. TRABOLD:  Yes, on whatever the first day is.

16      THE COURT:  Does she give them the stuff, it's not

17 clear what happens?

18      MR. PATTON:  Actually, another individual who was

19 living there gives them a box full of stuff.

20      THE COURT:  So while they're there, they then see a

21 bunch of sick looking horses, bad looking horses, dying horses,

22 as alleged.  That then prompts them to go get the warrant for

23 cruelty to animals.  The warrant for cruelty to animals is

24 defective, in your opinion, because it wasn't authorized by the

25 district attorney?

4

1       MR. PATTON: Correct.

2            MR. TRABOLD:  Just so you're clear, subsequent to

3  that argument being made, I questioned Trooper Mclellan about

4  that.  That appears to be without question factually accurate,

5  Francis Schulz, the District Attorney for Crawford County, did

6  not approve a warrant, nor did anyone else.

7            THE COURT:  It's a pure question of law whether

8  that's of any moment --

9            MR. PATTON:  That's correct.  I wouldn't see

10  spending any time at the hearing on Wednesday on that issue.

11            THE COURT:  That's good to know.  Up to that point

12  there's really no dispute on what happened.  Then armed with

13  that report, armed with that affidavit, they go back out to the

14  property, is that right?

15            MR. PATTON:  With the cruelty to animals search

16  warrant, yes.

17            THE COURT:  They go back out there on August 20th,

18  accompanied by, among other people, a chemist, who allegedly is

19  a horseman or knows something about horses?

20            MR. TRABOLD:  Correct.

21            THE COURT:  Would he have been there the first day,

22  August 17th --

23            MR. TRABOLD:  He was not there on the first day

24  because all that was happening on the 17th were two troopers

25  went to the house to basically pick up the material that Mr.

                                5

1   Michael Woods, the husband, spoke about.  If I could just

2   explain that.  Just so you have the proper context on how that

3   happened to begin with.  That was kind of -- I guess a good

4   faith showing by Mr. Woods when they first questioned him about

5   any information he had.  As a showing of good faith to the

6   officers, what he essentially said was hey, I still have stuff

7   out at my house if you want to go get it, we'll provide that to

8   you.

9           THE COURT:  Parenthetically, as they went out

10  pursuant to the invitation, did they conduct a full-blown

11  search, was the stuff already boxed and given to them?

12          MR. TRABOLD:  They did not conduct a full-blown

13  search.

14          THE COURT:  All right.  So we're now back on the

15  20th with the animal warrant and they're down in the basement

16  of the barn or something like that, they're wandering around

17  there, there's this room they see with the daughter standing in

18  front of and at some point Ms. Woods allegedly goes in and

19  comes running out or something like that. But to make a long

20  story short, there is alleged in plain view as the basis of

21  that sighting of what they believe to be a vial that's burning,

22  that's suggestive of methamphetamine. And they then go and get

23  another warrant, is that right?

24        MR. TRABOLD: Correct.

25        THE COURT: And then they go back, I guess

6

1  immediately go back to the property, is that right?

2        MR. TRABOLD: Essentially, what happens is as soon

3  as they notice smoke billowing out --

4        THE COURT: Didn't they get away, being afraid it

5  was going to blow up?

6        MR. TRABOLD: They get away, tape it off, whatever.

7  Then they get this warrant. The clandestine lab team goes back

8  in.

9        THE COURT: And the warrant they get, on the face of

10  the warrant it's for the barn and personal residence, is that

11  right, do you know?

12        MR. PATTON:  That one I just think is the barn.

13        MR. TRABOLD:  I want to say it's just for the barn.

14        THE COURT:  In any event, they go back to the barn,

15  there is no inventory that I have, I don't think as part of the

16  record I have in front of me, by way of description in the

17  briefs, they get there and there is some methamphetamine, is

18  that right, that is retrieved?

19        MR. TRABOLD:  I believe there's articles with --

20  there's articles with residue indicative of methamphetamine.

21        MR. PATTON:  First of all, your Honor, the warrant,

22  when they came back with the second warrant, it did on its face

23  cover the barn and a two-story red-sided house.

24        THE COURT:  Do you know if they searched everything

25  or just the barn?

                                7


1         MR. TRABOLD:  I think they did search everything.

2         THE COURT:  What did they get, that's what I want to

3   know?

4         MR. PATTON:  They get what is described as a beaker

5   of clear liquid, which was supposedly what was smoking.  And

file:///A|/WOODS519.TXT

6  that has muriatic acid in it.  They get a container that has a

7  high level of solution, that has at least some trace amounts of

8  methamphetamine, it has never been quantified as to how much

9  methamphetamine.  And a plastic jug with a hose running out of

10  the top of it.  The jug is empty.

11          MR. TRABOLD:  They also obtained isotone, which is a

12  list one precursor chemical.

13          THE COURT:  So on the basis of what they found right

14  there, the equipment to manufacture, some component parts and

15  some residue of actual meth.  I know the charges didn't come

16  then.  Upon that evidence, charges could have been filed right

17  there?

18          MR. PATTON:  In fact, the government charged her in

19  the first indictment based solely on this search for intent to

20  manufacture methamphetamine.

21          THE COURT:  That answers my question.  This is

22  coming clear for me.

23          MR. PATTON:  But that charge didn't happen until

24  after the October search.

25          THE COURT:  Let's keep going.  So tell me, there is

1  this initial indictment, then a superseding indictment?

2         MR. TRABOLD:  Correct.  The initial indictment, I

3  don't have the timing in front of me, the initial indictment

4  factually just covered the August episode.

5         MR. PATTON:  But the first indictment was brought

6  after the October search.

7         THE COURT:  Is that right?

8         MR. TRABOLD:  I think that's accurate.

9         THE COURT:  But the charges were limited to what

10  could be made out based upon what they found back earlier?

11         MR. TRABOLD:  Correct.  I believe she was indicted

12  in November of 2004, if I have that correct.

13         MR. PATTON:  They initially charged in Count 1 from

14  in and around August of 2004, to in around October of 2004, Ms.

15  Woods did knowingly, intentionally and unlawfully attempt to

16  manufacture methamphetamine.  Count 2 charges from in and

17  around August, 2004 to in and around October of 2004, she

18  possessed acetone, a list II chemical.

19         MR. TRABOLD:  She was charged for the timeframe to

20  include both the October and the August.

21      THE COURT: In the first indictment?

22      MR. TRABOLD: Correct. At the time of the

23  indictment in November, I did not have a full indication of

24  what the October situation involved by way of lab report. So

25  primarily the first indictment primarily reflects her situation

9

1  in August, but the timeframes extended in the indictment simply

2  to reflect the second one.

3      THE COURT: In the first indictment was she charged

4  with possession or possession with intent to distribute?

5      MR. TRABOLD: She was charged with attempt to

6  manufacture methamphetamine and possession of listed chemicals.

7      MR. PATTON: It was attempt to manufacture, that's

8  Count 1, attempt to manufacture. Count 2 is possession of

9  acetone.

10     THE COURT: All that was found the first time. Then

11  did the superseding indictment contain a specific quantity of

12  methamphetamine or what's the difference on the superseding

13  indictment?

14     MR. TRABOLD: The superseding indictment charges her

15  with actually manufacturing methamphetamine.

16        THE COURT:  Based on what they found in the bedroom?

17        MR. TRABOLD:  Correct.

18        MR. PATTON:  Count 2 is attempt to manufacture,

19  which covers the same time period as charged in the original

20  indictment.

21        THE COURT:  The first indictment is attempt to do

22  what?

23        MR. TRABOLD:  Manufacture.

24        THE COURT:  Both indictments charge attempt to

25  manufacture?

10

1        MR. TRABOLD:  The superseding indictment also

2  includes at Count 1 the actual manufacturing of

3  methamphetamine.

4        THE COURT:  Okay.  Here's my question.  We have,

5  isn't this a situation where you could be half right,

6  obviously, you could be all right, in which case everything is

7  suppressed, as a practical matter.  If, for instance, if I were

8  to conclude that the first search was good, but the last search

9   was bad, does it change anything?

10          MR. PATTON: It does. It would eliminate probably

11  Counts 4, 5, 6 and 7, which are all just possessing different

12  list I chemicals, that were a result of the October search.

13  Maybe the actual manufacturing charge may just go back to

14  attempt to manufacture and then the acetone.

15          MR. TRABOLD: That's correct. I do think it impacts

16  the case significantly. We essentially would be left to the

17  listed chemicals.

18          THE COURT: Attempt to manufacture and possession of

19  acetone. Probably affects the suggested guideline range, too,

20  I imagine.

21          MR. TRABOLD: Significantly.

22          MR. PATTON: It is fair to say a lot more was found

23  in the October search than was found in the August search.

24          THE COURT: And finally in conclusion, my confusion

25  was why didn't they charge her right away, why wasn't she


                                11


1   charged after the first search; but you're telling me she

2   wasn't charged after the first search, but the indictment was

3  really handed down after the second search but only related to

4  the first search?

5       MR. TRABOLD:  It relates to the second search in the

6  sense that the timeframes is extended out to cover this.

7       THE COURT:  As to probable cause, we're not taking

8  the probable cause that might have existed later, putting it

9  back as to what was just going on -- what you knew at the time

10  you were there the first time?

11       MR. TRABOLD:  Correct.

12       THE COURT:  All right, thank you, counsel.

13

14       (Whereupon, at 11:58 a.m., the proceedings were

15  concluded.)

16

17             - - -

18

19

20

21

22

23

24

25

                                    12

1              C E R T I F I C A T E
               _ _ _ _ _ _ _ _ _ _ _

2

3

4

5       I, Ronald J. Bench, certify that the foregoing is a

6   correct transcript from the record of proceedings in the

7   above-entitled matter.

8

9

10

11   _____

12   Ronald J. Bench

13

14

15

16

17

18

19

20

21

22

23

24

25