IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 04-54 Erie |
| | ) | |
| LYNDA LORRAINE WOODS | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S**
**MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE**

AND NOW comes the United States of America, by its attorneys, Mary Beth Buchanan, United States Attorney for the Western District of Pennsylvania, and Christian A. Trabold, Assistant United States Attorney for said district, and avers as follows:

**Procedural History**

On January 11, 2005, a federal grand jury returned a seven count superseding indictment charging Woods with a variety of methamphetamine related offenses. Specifically, Woods was charged with manufacturing methamphetamine (Count 1), attempting to manufacture methamphetamine (Count 2), and possessing pseudoephedrine, iodine, red phosphorous, and hydriodic acid with the intent to manufacture methamphetamine (Counts 3 through 7). The charges were the result of the execution of two separate search warrants at Woods' residence on August 20, 2004, and October 20, 2004.

After her indictment, Woods sought the suppression of the evidence found during the execution of both search warrants. Following the July 8, 2005, suppression hearing, the district court issued an order denying Woods' motion to suppress. After the

denial of her motion to suppress, Woods entered a conditional guilty plea to Count One of the superceding indictment, preserving her right to appeal the propriety of the search warrant executed at her home on October 20, 2004. Woods did not, however, preserve her right to appeal the validity of the search warrant executed at her residence on August 20, 2004. As part of her plea agreement, Woods specfically waived the right to file a motion to vacate sentence, under 28 U.S.C. §2255, attacking her conviction or sentence, and the right to file any other collateral proceeding attacking her conviction or sentence.

After a sentencing hearing on November 18, 2005, Woods was sentenced to a term of imprisonment of 85 months, and a term of supervised release of three years. Woods then appealed the district court's order denying her motion to suppress to the Third Circuit. On October 24, 2007, the Third Circuit affirmed the district court's denial of Woods' motion to suppress. <u>United States v. Woods</u>, 254 Fed. Appx. 889 (3d Cir. 2007).

**Factual History**

On August 17, 2004, Pennsylvania State Police Troopers Bill McClelland and Ron Wilson interviewed Michael Woods, Lynda Woods' husband, at the Erie County Prison. At the time, Michael Woods was awaiting sentencing in federal court after having entered a guilty plea to a charge of manufacturing methamphetamine. During the course of the interview, Michael Woods informed the Troopers that he currently had methamphetamine production materials on his

2

property. Michael Woods then offered to turn over those materials to the Troopers.

Troopers McClelland and Wilson then traveled to the Woods property. Upon arrival, they explained the situation to Lynda Woods. Ms. Woods then signed a consent to search form and allowed the Troopers access to her property for the purpose of retrieving the methamphetamine manufacturing equipment.

Once on the property, the Troopers immediately took note of a gruesome spectacle. A vast array of animals were being kept in unspeakable conditions. A number of horses were being kept in stalls in the basement of the Woods' barn. The horse stalls obviously had not been cleaned in some time as they were deep with manure. Moreover, there was no food or water in the stalls. Outside the barn, there were a number of horses in a fenced pasture area that was covered in manure and also did not contain any food or water. Two dogs were observed chained to doghouses in the yard. The area around these doghouses was filthy without food or water.

Upon examining another area of the property, the Troopers discovered a horse lying dead in the pasture next to the barn. Ms. Woods claimed the horse had been struck by lightning. The Troopers then walked to the tree line on the Woods property and observed a horse tied to a tree. The horse had eaten every scrap of vegetation within reach and had no water. Upon approaching the horse, Trooper Wilson thought the animal had a black colored face.

Unfortunately, a closer inspection revealed that the horse's face was covered with flies.  Further inspection of other areas of the tree line revealed that horses had eaten the bark from some of the trees.

In light of the volatility of the hazardous methamphetamine equipment the Troopers were there to retrieve, PSP's Clandestine Laboratory Response Team was tasked with the responsibility of taking those materials into custody.  Two members of that team, Corporal James Coyle and PSP chemist John Kelton, whom both own horses, expressed to Troopers McClelland and Wilson that the horses were in desperate need of care.

On August 19, 2004, Trooper McClelland contacted Rebecca McDonald of the Pennsylvania Society for the Prevention of Cruelty to Animals (PASPCA) in Shippenville, Pennsylvania about the conditions at the Woods' property.  Ms. McDonald informed Trooper McClelland that she was familiar with the location because she had removed seven horses from the Woods' property on May 7, 2004, because the animals were emaciated and living in unsanitary confinement.  Ms. McDonald further indicated that she checked with the Marley Veterinary Clinic and discovered that a veterinarian had not been to the Woods' property in two years.

On August 20, 2004, Trooper McClelland obtained and executed a search warrant to search for evidence of animal cruelty at the Woods' property.  Assisting Trooper McClelland in the execution of

the search warrant were Troopers Hendricks and York, PSP Chemist John Kelton, and Rebecca McDonald from the PASPCA. Mr. Kelton assisted in the execution of the search warrant because he had been at the property on August 17th and as a horse owner he had expertise that was deemed to be beneficial to the execution of the warrant.

Upon entering the property to execute the warrant, the officers were met by Lacey Woods, Lynda Woods' 18 year old daughter. Trooper McClelland informed Lacey that he needed to speak to her mother. Lacey then proceeded to the barn on the property and the officers observed Lynda Woods exiting the basement of the barn. Lynda Woods was provided a copy of the search warrant and informed that the PASPCA was there to seize all neglected animals. Lynda Woods then stated that she had records that the animals had been treated recently by a veterinarian. Ms. Woods then went toward her residence, apparently to retrieve these records.

Trooper McClelland and the others assisting him then proceeded to the basement of the barn based on their previous knowledge that horse stalls were located in that area. Ms. McDonald then attempted to look in a back room located in the rear of the basement. Her attempt was thwarted, however, when Lacey Woods stood in front of Ms. McDonald and prevented her entry into the room while saying "there aren't any horses in there." Ms. McDonald then replied that she merely wanted to look in the room to see if

5

it contained any horse feed.  Whereupon, Lynda Woods appeared and said she had left the keys she needed in the back room.  Lynda Woods then entered the back room and quickly exited carrying a set of keys.  Shortly thereafter, the officers noted that the basement of the barn was filling with smoke and a noxious odor.  The smoke was then observed coming from the back room to which Lacey Woods had barred entry and Lynda Woods had just exited.  Due to their obvious concern that something was on fire, the Troopers then looked into the back room and observed smoke billowing from a glass jar.  Based upon the observations, John Kelton surmised that a chemical reaction was occurring inside the glass jar.  Everyone was then ordered out of the barn and a secure perimeter was then established around it.  The Clandestine Laboratory Response Team was then contacted and Troopers McClelland and York then obtained a second search warrant for the property based upon their observations.  The execution of that warrant resulted in the seizure of hydrochloric acid, acetone, hydriodic acid and sodium chloride, which are precursor chemicals used to manufacture methamphetamine.  The Troopers also seized lab equipment containing methamphetamine residue and methamphetamine in its unfinished liquid form.

On October 20, 2004, law enforcement personnel from the Titusville Police Department and the Pennsylvania Attorney General's Bureau of Narcotics Investigation (BNI) executed a search

warrant at Lynda Woods' property located at 1501 Meadville Road in Titusville, Pennsylvania. Prior to presenting the search warrant to the district justice for approval, the search warrant was approved by the Venango County District Attorney's Office.

The execution of the search warrant resulted in the seizure of a working methamphetamine production lab. Numerous precursor chemicals, including iodine, red phosphorous and hydriodic acid, were seized, as well as chemical solutions containing methamphetamine in its unfinished state. Over 50 grams of pseudoephedrine were seized as well as all manner of methamphetamine production equipment. The lab was located in a second floor bedroom. Two garbage bags full of matchbox covers were located in another bedroom which contained evidence that it was being used by Lacey Woods. These matchbox covers are evidence that red phosphorous, a methamphetamine precursor chemical, was being obtained by the scraping of matches and the matchbox striker plates.

Upon entering the Woods residence to execute the warrant at approximately 11:15 p.m., law enforcement personnel encountered Woods' two daughters, one of whom is under 18 years of age, sleeping on the first floor of the residence. In light of the hazardous conditions presented by the lab, the children were immediately removed from the residence. As with most methamphetamine labs, the situation was deemed sufficiently

hazardous to cause those officers and agents searching the residence to wear self contained breathing apparatuses.

**Argument**

    **A. Woods' motion should be denied because she waived the right to file a motion to vacate sentence, under 28 U.S.C. §2255.**

The plain language of Woods' plea agreement at paragraph A5 makes clear that Woods "waives the right to file a motion to vacate sentence, under 28 U.S.C. §2255, attacking her conviction or sentence, and the right to file any other collateral proceeding attacking her conviction or sentence." (Plea Agreement). Woods signed the plea agreement and in doing so ackowledged that she had read the agreement and discussed it with her counsel, Assistant Federal Public Defender Thomas Patton.

At Woods' change of plea hearing on August 8, 2005, the attorney for the government explained the provisions of the plea agreement in open court. This discussion specifically included an explanation that Woods was waiving the right to file "a collateral attack or a habeas petition." (N.T., Change of Plea, August 8, 2005, p. 10). The plea agreement was then admitted into evidence as government's exhibit 1. (N.T., Change of Plea, August 8, 2005, p. 11). Later in the plea colloquy, Woods readily ackowledegd that she had read and reviewed the plea agreement, discussed it with her attorney, understood the agreement, and agreed with it. (N.T.,

Change of Plea, p. 12).  Woods then subsequently acknowledged that she understood that her "right to appeal in this case has been circumscribed by the terms and conditions of your previously described plea agreement." (N.T., Change of Plea, p. 14).

It is well established in the Third Circuit that waivers of appeals, if entered knowingly and voluntarily, are valid, unless they result in a miscarriage of justice. United States v. Jackson, ___ F.3d ___, 2008 WL 1776582 (3d Cir. 2008); United States v. Shedrick, 493 F.3d 292, 297 (3d Cir. 2007); United States v. Gwinnett, 483 F.3d 200, 205 (3d Cir. 2007); United States v. Schweitzer, 454 F.3d 197 (3d Cir. 2006); United States v. Lockett, 406 F.3d 207, 213 (3d Cir. 2005); United States v. Khattak, 273 F.3d 557, 563 (3d Cir. 2001). The appeal waiver does not strip the court of jurisdiction, but that jurisdiction should not be exercised "absent compelling circumstances." Shedrick, 493 F.3d at 297.

The appellate waiver in Jackson was upheld by the Third Circuit based upon a holding that the defendant's unreasonable sentence claim was insufficient to invalidate the waiver because there was not a miscarriage of justice.  The Jackson court noted that while the Third Circuit has not provided a precise definition of the phrase "miscarriage of justice", the Court has advanced several factors to consider "when determining whether to enforce an otherwise proper appellate waiver."  Smith, 2008 WL 1776582 at *7.

9

These factors include:

> the clarity of the error, its gravity, its character (e.g. whether it concerns a fact issue, a sentencing guideline, or a statutory maximum); the impact of the error on the defendant, the impact of correcting the error on the government, and the extent to which the defendant acquiesced in the result.

Smith, 2008 WL 1776582 at *7, (quoting Khattak, 273 F.3d at 563 (further citation omitted)). The Shedrick court refused to enforce the appeal waiver when faced with the defendant's claim that ineffective assistance of counsel had prevented him from understanding his plea and filing a direct appeal. Under those circumstances, the Third Circuit held that enforcing the appeal waiver would result in a miscarriage of justice. Id. at 297-98. In Gwinett, the district court went through a detailed colloquy with the defendant similar to Woods' plea colloguy in this case. The Third Circuit found that in light of the colloquy, it was clear the defendant's appeal waiver was knowing and voluntary.

    Here, the appeal waiver and all other aspects of her guilty plea were painstakingly explained to Woods. As such, she cannot credibly claim that she did not knowingly and voluntarily waive her right to file a habeas petition. Unlike the Shedrick defendant, Woods filed a direct appeal, and does not claim that she did not understand her plea.

    The application of the factors enunciated in Jackson and Khattak is also not in Woods' favor. Woods claims her counsel was

ineffective for failing to inform her of the safety valve reduction. Nevertheless, this claim is far from clear error on counsel's part because Woods has failed to establish that she was willing to provide a proffer or informed her counsel of said willingness.

Second, the claimed error is far from grave as it relates merely to a two level reduction in the applicable guideline range. Third, Woods is not claiming an error which resulted in an unknowing or involuntary plea or a deprivation of her right to trial. Nor does she claim innocence or an illegal sentence. She is merely claiming an error prevented her from making a proffer, for which there is no guarantee she would have received credit. Fourth, the impact of the alleged error on Woods was minimal in that it involves only a two level difference in offense level. Fifth, the impact on the government is significant in that correcting the alleged error provides a sentence reduction for someone who never provided any useful information to the government. Obviously, any information Woods has to provide now is entirely useless almost four years after she committed the offenses. Likewise, the government's recollection is that throughout the investigation and prosecution of her case, Woods remained extremely hostile toward the government, not only based upon her own situation, but also in light of the prosecution of her husband and his lengthy sentence. Sixth, Woods does not even

claim, much less establish, that she ever told her counsel she wanted to cooperate or provide a proffer. Again, the facts do not indicate that Woods was remotely interested in providing a proffer. She was caught on two separate occasions, over about two months, making methamphetamine. On neither occasion did she attempt to cooperate. Rather, each time she tried to conceal her activity and lie to the police. Now, of course, she wants a sentence reduction for something that did not interest her prior to her sentencing. Therefore, in light of these factors, there will be no miscarriage of justice if Woods' obviously knowing and voluntary appellate waiver is upheld.

> **B.    Woods is not entitled to a safety valve reduction because she failed to make a proffer to the government concerning the offense and cannot establish that her counsel was ineffective.**

The government concedes that Woods met the first four requirements for the two level safety valve reduction as set forth at U.S.S.G. § 5C1.2(a)(1-4). Nevertheless, Woods did not satisfy the requirement set forth at U.S.S.G. § 5C1.2(a)(5) because she did not at any time truthfully provide to the government "all information and evidence the defendant has concerning the offense ..." By not providing any information to the government concerning the offense, Woods lost her ability to qualify for the safety valve reduction.

Notwithstanding her failure to proffer, Woods claims she is

entitled to relief because her counsel was ineffective for failing to inform her about the possibility of a safety valve reduction. According to the Supreme Court, Woods must demonstrate that her attorney's performance was deficient and that she was prejudiced by the deficiency. Strickland v. Washington, 466 U.S. 668, 687 (1984); Shedrick, 493 F.3d at 299. In other words, Woods must prove that counsel's performance "fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 688-94, Shedrick, 493 F.3d at 299.

Woods' ineffectiveness claim fails for several reasons. First, she has not alleged, nor established, that she indicated to counsel a desire to cooperate or provide the government with a proffer. Second, Woods cannot now establish that her proffer would have been sufficient to justify the two point reduction in offense level. The safety valve provision requires the defendant to reveal a broader scope of information about the relevant criminal conduct to the authorities than is necessary in order to qualify for an acceptance of responsibility reduction. United States v. Sabir, 117 F.3d 750, 752-54 (3d Cir. 1997); United States v. Holguin, 2008 WL 241378 (3d Cir. 2008)(defendant who did not provide a consistent explanation of her involvement in the drug enterprise, nor explain her relationship with co-conspirators was not entitled to safety

valve reduction); <u>United States v. Espinoza-Cruz,</u> 244 Fed. Appx. 421 (3d Cir. 2007) (defendant who failed to provide complete information about how he became involved in drug transaction not entitled to safety valve reduction).  Woods cannot establish that she was prejudiced by counsel's alleged failure to inform her about the safety valve because she cannot show that she would have qualified for the reduction if she had been properly informed.  Third, Woods consistently demonstrated a hostility toward the government throughout the prosecution of her case.  Her prior attitude contradicts her current claim of a desire to provide a proffer.

WHEREFORE, the government respectfully requests that Woods' Motion to Vacate, Set Aside, or Correct Sentence be denied.

    Respectfully submitted,

    MARY BETH BUCHANAN
    United States Attorney

    <u>s/ Christian A. Trabold</u>
    CHRISTIAN A. TRABOLD
    Assistant U.S. Attorney
    PA ID No. 75013